Dr. Joy HOCHSTADT,
Plaintiff-Appellant,

v.

WORCESTER FOUNDATION FOR
EXPERIMENTAL BIOLOGY et
al., Defendants-Appellees.

No. 76–1019.

United States Court of Appeals,
First Circuit.

Argued June 1, 1976.

Decided Sept. 24, 1976.

Nancy Gertner, Boston, Mass., with whom Harvey A. Silverglate and Silverglate, Shapiro & Gertner, Boston, Mass., were on brief, for plaintiff-appellant.

Ramon V. Gomez, Atty., EEOC, Washington, D.C., with whom Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, Beatrice Rosenberg and Charles L. Reischel, Attys., EEOC, Washington, D.C., were on brief, for Equal Employment Opportunity Com'n, amicus curiae.

John Taylor Williams, Boston, Mass., with whom Judith Ashton and Haussermann, Davison & Shattuck, Boston, Mass., were on brief, for appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

■ This case arises on an appeal from the denial of a preliminary injunction. Claiming violation of her rights under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e, et seq., Dr. Joy Hochstadt brought this suit for interim relief pending disposition by the EEOC of her complaint of unlawful employment practices committed by her employer, the Worcester Foundation for Experimental Biology (the Foundation).[1] She seeks, among other relief, an affirmative order requiring the Foundation to revoke its decision to terminate her employment until the EEOC decides whether there is reasonable cause to believe that her charge is true, and to bring suit on her behalf. She claims that her discharge violated section 704(a) of the Act, 42 U.S.C. § 2000e–3(a),[2]

---

1. Prior to seeking preliminary relief in the district court, Dr. Hochstadt had filed a complaint against her employer with the Equal Employment Opportunity Commission (EEOC) and with the Massachusetts Commission Against Discrimination (MCAD). Accompanying her complaint to the EEOC was a request that the EEOC immediately seek preliminary injunctive relief under section 706(f)(2) of the Act, 42 U.S.C. § 2000e–5(f)(2). A week after filing the complaint with the MCAD, the plaintiff sought and obtained a waiver of jurisdiction by the MCAD. This waiver of jurisdiction allowed the EEOC to proceed with its investigation of the charge. See 42 U.S.C. § 2000e–5(c). Shortly thereafter the Boston District Director of the EEOC informed Dr. Hochstadt that it would be unable to make timely application for a preliminary injunction because of the large backlog of cases in the Boston office. Although there is no statutory sanction for such a proceeding, plaintiff then brought this action on her own behalf seeking interim relief pending disposition by the EEOC of her charge. Neither the district court's denial of the preliminary injunction nor our review thereof forecloses EEOC investigation into Dr. Hochstadt's charges of discrimination. See *Drew v. Liberty Mutual Ins. Co.,* 480 F.2d 69 (5th Cir., 1973), *cert.*

denied, 417 U.S. 935, 94 S.Ct. 2650, 41 L.Ed.2d 239 (1974). However the issue of preliminary injunctive relief is resolved, the EEOC investigation remains a statutory prerequisite to judicial determination of the merits of this case. The statute calls for the Commission to decide if there is reasonable cause to believe that the charge is true, 42 U.S.C. § 2000e–5(b), and authorizes it to sue on Dr. Hochstadt's behalf if such is the case, 42 U.S.C. § 2000e–5(f)(1). Should the Commission dismiss her charge, Dr. Hochstadt individually may then sue the Foundation. *Id.*

2. In pertinent part:
 "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter [i. e., 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . '] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

because it was in retaliation for her opposition to unlawful employment practices of the Foundation. After a five-day hearing, the district court denied the application for preliminary injunction, concluding that plaintiff had failed to prove the likelihood of success on the merits of her claim of discrimination. We first considered this case on petitioner's motion for injunction pending appeal, which we denied. After having had the benefit of further argument and more extensive briefing, we remain unpersuaded that the district court abused its discretion in denying relief.[3]

I

■ Before coming to the principal issues on appeal, we shall briefly consider the district court's power to afford relief. The Civil Rights Act does not provide specifically that an alleged victim of discrimination may privately obtain preliminary relief prior to the time the EEOC investigates and decides whether or not to bring suit in its own name, see notes 1 and 3, supra. Whether under the 1972 Amendments the right to maintain such an independent preliminary proceeding to preserve the status quo of employment can be implied, or whether such a private proceeding runs counter to the congressional scheme calling for an initial agency investigation into whether there is reasonable cause to believe that the charge is true, is a question that has not been resolved by the Supreme Court. The court below ruled that it could entertain Dr. Hochstadt's request for preliminary injunctive relief pending EEOC action and there is some support for this view, see Berg v. Richmond Unified School District, 528 F.2d 1208 (9th Cir., 1975), petition for cert. filed, 44 U.S.L.W. 3459 (U.S. February 17, 1976); Drew v. Liberty Mutual Ins. Co., 480 F.2d 69 (5th Cir., 1973), cert. denied, 417 U.S. 935, 94 S.Ct. 2650, 41 L.Ed.2d 239 (1974). There are, however, district court decisions to the contrary. See Troy v. Shell Oil Co., 378 F.Supp. 1042 (E.D.Mich., 1974), appeal dismissed as moot, 519 F.2d 403 (6th Cir., 1975); Collins v. Southwestern Bell Tel. co., 376 F.Supp. 979 (E.D.Okla., 1974). The Foundation does not raise the question on appeal, though the EEOC, in an amicus brief, endorses the district court's assumption of jurisdiction. In view of the district court's extensive consideration of the substantive aspects of Dr. Hochstadt's claim, and of the fact that we find no error in the court's denial of relief, we shall not rule on the issue, but shall assume, without deciding, that the court below had authority to grant or deny the relief sought.

II

■ After conducting the five-day hearing, listening to the testimony of seven senior scientists at the Foundation, and reviewing the extensive documentary evidence, the district court prepared a comprehensive memorandum containing its findings and rulings of law. Although the court found that plaintiff had initially demonstrated a prima facie case, which shifted to the Foundation the burden of proving that it had discharged her for legitimate and nondiscriminatory reasons, it found that the Foundation had met this burden.[4]

---

**3.** This proceeding differs from the usual application for a preliminary injunction in view of the fact that subsequent court proceedings will await separate action by the EEOC, should its eventual investigations convince it to support the complaint. Presumably the EEOC may ask for another preliminary injunction if new facts are unearthed, and plaintiff will be able to receive damages if she ultimately prevails even if, as now seems likely, it is too late for equitable relief.

**4.** Plaintiff contends that she was not provided with an opportunity at the close of defendant's case to rebut defendant's evidence and show that the reasons given for her discharge were pretextual. But the district court has extensive discretion to structure the admission of evidence, see United States v. Hathaway, 534 F.2d 386, 401 (1st Cir. 1976), and we find no error or abuse of discretion here in the absence of any claim of surprise articulated by plaintiff to the trial judge, accompanied by an offer of proof and a request to reopen the evidence. Cf. Moylan v. Siciliano, 292 F.2d 704 (9th Cir. 1961). See generally Fed.R.Civ.P. 46; Fed.R.Evid. 103(a)(2). The district judge's advance indication that he meant to conclude when the de-

Accordingly the court held that plaintiff had not established a likelihood of success on the merits sufficient to entitle her to preliminary injunctive relief. The court's findings supporting this conclusion may be summarized as follows:

The Worcester Foundation for Experimental Biology is a nonprofit institution primarily committed to basic biomedical research, employing some 250 persons. The Foundation devotes $1.8 million of its annual budget to cancer research in what is known as the Cell Biology Program. The principal investigator is Dr. Mahlan Hoagland, who is also the Director of the Foundation. Dr. Hoagland has recruited other scientists to join the program since its inception, and in 1971 recruited Dr. Harvey Ozer, a virologist, to fill a specific need in the program.

Dr. Ozer informed Dr. Hoagland of the availability and interest of his wife, Dr. Joy Hochstadt, in joining the Foundation. Dr. Hochstadt is a microbiologist, whose research into cell membrane functions, described by one scientist at the hearing as "pioneering", fit into the Foundation's research program. In September, 1971, Dr. Hoagland offered both Dr. Ozer and Dr. Hochstadt positions as senior scientists. Dr. Ozer's salary was set at $24,000, while Dr. Hochstadt's salary was set at $18,000. These salaries reflected the needs of the institution. Dr. Ozer and Dr. Hochstadt accepted the employment offers on October 1, but thereafter Dr. Hochstadt sought to renegotiate her salary, claiming it was discriminatory and illegal. The Foundation reluctantly acceded to readjust the salaries of Dr. Hochstadt and Dr. Ozer so that each would receive $21,000.

After starting her employment in January, 1972, Dr. Hochstadt joined the small group of cell biologists and participated in the periodic meetings of the group held to discuss policies, recruitment, and direction of research. At these meetings, Dr. Hochstadt early began to interpose personal grievances and salary complaints, to discuss the inadequacy of the Foundation's affirmative action program, and to criticize the Foundation's administration and its director, Dr. Hoagland, and assistant director, Dr. Welsch. These complaints interfered with the meetings, disrupted the discussions, and eventually caused discontinuation of the meetings.

In January, 1973, after they had been at the Foundation for over a year, Dr. Hochstadt and Dr. Ozer each sought from the Foundation $3,000 in lump sum back pay and a $3,000 salary increase to compensate for unanticipated moving expenses and the cost of living increase. In March, 1973, plaintiff was given a $1,500 (4.5%) increase as a result of the Foundation's annual salary review. Dr. Hoagland indicated that she would receive a larger raise the following year "when you've effectively joined the team."

In July, 1973, Dr. Hochstadt filed formal charges with the Massachusetts Commission Against Discrimination (MCAD), the EEOC, and the Department of Labor, alleging that the Foundation had discriminated against her by setting her starting salary much lower than that for male scientists starting work at the same time. One month later, she filed a class action complaint with the Department of Health, Education, and Welfare on behalf of all female employees at the Foundation. The complaint filed with HEW caused the Department to request the Foundation to implement an affirmative action plan. In June, 1974, the MCAD found reasonable cause to credit Dr. Hochstadt's complaint, but deferred further consideration of the charge pending action by the EEOC. In September, 1974, Dr. Hochstadt filed suit against the Foundation pursuant to § 2000e–5(f)(1), removing the case from the jurisdiction of the EEOC. In December, 1974, the Foundation settled with Dr. Hochstadt for $20,000.

Subsequent to her minimal increase and the filing of these charges, plaintiff sought to elicit salary information from other scientists and personnel at the Foundation,

---

fendant's case was in did not relieve plaintiff from the usual affirmative obligation in this regard. *Cf. Adams Dairy Co. v. St. Louis Dairy Co.,* 260 F.2d 46 (8th Cir. 1958).

and on several occasions this conduct interfered with ongoing research and upset the other scientists and research assistants who were approached.

Plaintiff also circulated rumors that the Foundation would lose much of its federal funding because it was not complying with regulations concerning affirmative action programs. To allay the apprehension created by these rumors, on at least three occasions the Foundation had to invite an official from HEW to assure scientists at the Foundation that they were in no danger of losing federal funding.

In April, 1974, Dr. Hochstadt invited Dr. Helene Guttman, an officer of the Association of Women in Science, to conduct a covert affirmative action survey at the Foundation, ostensibly while attending a scientific seminar. Dr. Guttman later wrote to Congressman Edwards indicating her findings that the Foundation was not in compliance with federal regulations and critical of HEW's handling of Dr. Hochstadt's complaint of discrimination against the Foundation, and she sent copies of the letter to eight other members of Congress.

Also in 1974, Dr. Hochstadt invited a reporter from the *Worcester Telegram* to examine her files containing confidential salary information for employees at the Foundation. The reporter wrote several articles in the *Telegram.*

In mid-1974, the associate director, Dr. Welsch, complained to Dr. Hochstadt about her use of the Foundation's telephone for personal calls to her lawyer and to Dr. Guttman amounting to over $950 and her misuse of secretarial assistance and xeroxing services.

In late 1974, two research assistants in Dr. Hochstadt's laboratory left the Foundation because of their difficulties with Dr. Hochstadt. Complaints from subordinates in other laboratories never reached the level of the complaints of Dr. Hochstadt's research assistants.

In 1974, the director of the Foundation requested Dr. Hochstadt to complete a grant renewal application on behalf of the institution. She procrastinated in this task and ultimately prepared a deficient application which the sponsor denied. Another faculty scientist was appointed to correct and resubmit the application, which was approved on resubmission.

In December, 1974, Dr. Hochstadt was criticized for errors in one of her personal grant applications for its misstatements, which were contrary to Foundation guidelines. No grant application of any other scientist had included similar errors.

In response to an academic evaluation and a limited salary increase in early 1975, Dr. Hochstadt met with Dr. Welsch, accused him of being Dr. Hoagland's "office boy" and "hatchet man", and added that Dr. Hoagland would have to learn that he did not control the Foundation. Ten days later, she met with the Foundation's EEOC officer, Dr. Gibbons, demanding corrective action and threatening litigation.

In a final meeting with Dr. Welsch less than a week later, on May 7, 1975, plaintiff indicated that she and Dr. Ozer could not stay on the same campus as Dr. Hoagland, and that Welsch should choose sides in the dispute. In response to Dr. Welsch's inquiry regarding her threat to sue the Foundation, Dr. Hochstadt said she did not threaten to sue, but "I promise a lawsuit." Approximately one month after this meeting, the Foundation discharged Dr. Hochstadt, stating "your continuing lack of cooperation, disruptive influence, hostility, and threats toward the Institution and its Directors have made such termination necessary."

In addition to the above findings indicating Dr. Hochstadt's poor relations with other scientists, there is a considerable body of evidence in the record pointing strongly in the same direction: a protest by a senior scientist, Dr. Fairbanks, that grant proposals of Dr. Hochstadt incorrectly characterized and took credit for his work; complaints from other scientists to Dr. Welsch critical of Dr. Hochstadt's behavior; and testimony of Dr. Luftig that he and six other scientists had unanimously agreed in December,

1973, to draft a petition to other scientists asking the faculty of the Foundation to seek Dr. Hochstadt's resignation.[5]

On the basis of its findings, the district court concluded that Dr. Hoagland and Dr. Welsch determined to discharge Dr. Hochstadt in the spring of 1975 after her abusive and threatening statements to Dr. Gibbons and Dr. Welsch and her attempt to pit Dr. Welsch against Dr. Hoagland. In its words, these incidents "demonstrated a renewal of plaintiff's disruptive and hostile manner and conduct, inimical to the Foundation, its directors and scientists . .."

### III

In reviewing the granting or denial of a preliminary injunction, the standard is whether the district court abused its discretion. An appellate court's role is to decide whether the district court applied proper legal standards and whether there was reasonable support for its evaluation of factual questions. *See Roselli v. Affleck,* 508 F.2d 1277 (1st Cir., 1974); *Automatic Radio Mfg. Co. v. Ford Motor Co.,* 390 F.2d 113 (1st Cir.), *cert. denied,* 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968). If so, its judgment must stand. Our review of the present record convinces us that the district court's factual findings are adequately supported, and that it committed no legal error.

The factual question presented to the district court in this case was whether or not to accept Dr. Hochstadt's contention that she was discharged by way of retaliation for her opposition to unlawful employment practices—most notably, her complaint of salary discrimination which the MCAD found reasonable cause to credit, and which the Foundation eventually settled in her favor. After an extensive hearing, the district court found not. Intermingled with that question is a legal question, namely, whether Dr. Hochstadt's hostile conduct, which she justifies as arising from her opposition to the Foundation's allegedly illegal employment practices, afforded an independent, nondiscriminatory basis for her discharge, or whether it was protected "opposition" conduct under section 704(a), *see* footnote 2, *supra.* It is not claimed that she was fired for scientific incompetence; and where an employee is discharged for aggressive and allegedly disruptive activities associated with her complaints of discrimination, it is plainly a delicate matter to separate out the protected from the nonprotected conduct.

The events which seem most immediately to have triggered her discharge were a low "academic" evaluation issued by the Foundation administration in April, 1975, followed by bitter and angry exchanges. Dr. Hochstadt views the low evaluation as retaliatory for her previous salary complaints, which had only recently been adjusted in her favor. The district court, however,

---

5. Plaintiff testified on her own behalf and introduced two witnesses, Dr. Robert Holley and Dr. Earl Baril. Dr. Holley, the principal investigator for the Cancer Core Program at the Salk Institute in California, testified to Dr. Hochstadt's leadership in her field of research but could not testify concerning her working relationship with other scientists or to conditions at the Foundation. Dr. Baril, a senior scientist at the Worcester Foundation and chairperson of its EEO Council, testified under subpoena that he had a positive relationship with Dr. Hochstadt with no greater number of annoyances than those caused by any other colleague.

Five scientists from the Foundation, including Dr. Hoagland and Dr. Welsch, offered testimony of their own poor working relations with the plaintiff and related the complaints of other scientists. In addition, in support of its motion to deny preliminary relief, the Foundation introduced affidavits from two former colleagues of Dr. Hochstadt. Dr. Earl Stadtman, Chief of the Laboratory of Biochemistry at the National Heart and Lung Institute of the National Institutes of Health, had supervised Dr. Hochstadt from 1968–1971 and stated that "Dr. Hochstadt managed to antagonize everyone in the laboratory. One by one the members of the staff came to see me to request that something be done about her." Dr. H. R. Kabach, who worked with plaintiff in Dr. Stadtman's laboratory, observed that Dr. Hochstadt "is very disruptive and seems to thrive on setting one individual against another. This particular trait makes it difficult, if not impossible, for her to tolerate a situation which involves more than one person."

seems to have credited testimony of the Foundation's director that she was down-rated because of her lack of service to the institution. The factor of service was said by the director to be considered in evaluating the work of all scientists at the Foundation. That Dr. Hochstadt was deficient in this aspect of her employment is supported, among other things, by the court's findings of errors in her preparation of grant requests, and her abuses of secretarial, xeroxing, and telephone facilities. On this record, we cannot say the court erred in not finding that Dr. Hochstadt's low evaluation was retaliatory.

▮ Following the low evaluation, Dr. Hochstadt engaged in bitter personal exchanges with Dr. Welsch and Dr. Gibbons, which included comments indicating plaintiff's belief that the Foundation's director would have to learn he did not "control" the Foundation. She was thereafter discharged. In deciding that the discharge was nondiscriminatory, nonretaliatory and justified, the district court plainly regarded plaintiff's protests as insubordinate and excessive, seeing them as "a renewal of plaintiff's disruptive and hostile manner and conduct, inimical to the Foundation, its directors and scientists . . . ." This finding indicates a belief not only that plaintiff went too far in the scope and style of her protests over the low evaluation; it also implies, as do the court's other findings on the subject, that plaintiff's previous conduct—most of it taking place during the earlier salary dispute—was excessively disruptive and hostile, and could at a later date, notwithstanding the settlement, be taken into account in determining plaintiff's suitability for continued employment. It is here that the case gives rise to its most serious legal problem—whether plaintiff's overall conduct was so generally inimical to her employer's interests, and so "excessive", as to be beyond the protection of section 704(a) even though her actions were generally associated with her complaints of illegal employer conduct. We conclude that although plaintiff's original salary complaint may have been justified, and although her later complaint over her poor rating—whether or not justified—was one which she was entitled to make in an appropriate way, still neither of these could insulate her deportment from adverse scrutiny insofar as it went beyond the pale of reasonable opposition activity.

Neither in its wording nor legislative history does section 704(a) make plain how far Congress meant to immunize hostile and disruptive employee activity when it declared it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e–3(a). The statute says no more, and the committee reports on the Civil Rights Act of 1964 and the Equal Employment Opportunity Act of 1963, which later became Title VII of the Civil Rights Act, repeat the language of 704(a) without any explanation. *See* H.Rep.No.914, 88th Cong., 2d Sess., U.S. Code Cong. & Admin.News, p. 2401 (1964); H.Rep.No.570, 88th Cong., 1st Sess. 5 (1963). The proceedings and floor debates over Title VII are similarly unrevealing. Courts are thus left to develop their own interpretation of protected opposition.

▮ Certain broad premises can be accepted with confidence. Congress certainly did not mean to grant sanctuary to employees to engage in political activity for women's liberation on company time, and an employee does not enjoy immunity from discharge for misconduct merely by claiming that at all times she was defending the rights of her sex by "opposing" discriminatory practices. An employer remains entitled to loyalty and cooperativeness from employees:

> "[M]anagement prerogatives . . . are to be left undisturbed to the greatest extent possible. Internal affairs of employers . . . must not be interfered with except to the limited extent that correction is required in discrimination practices."

Additional views on H.R. 7152, U.S.Code Cong. & Admin.News, p. 2516 (88th Cong., 2d Sess., 1964). On the other hand, section

704(a) clearly does protect an employee against discharge for filing complaints in good faith before federal and state agencies and for registering grievances through channels appropriate in the particular employment setting.

It is less clear to what extent militant self-help activity falling between these two poles, such as particular types of on-the-job opposition to alleged discrimination, vociferousness, expressions of hostility to an employer or superior and the like, are protected. In the instant case, the issue is clouded by a sophisticated employment setting which lacks a rigid structure and within which it is not always easy to assess when an employee—in this case a highly educated senior scientist—clearly oversteps the bounds.

 In such instances, we think courts have in each case to balance the purpose of the Act to protect persons engaging reasonably in activities opposing sexual discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.[6] Allowing an employee to invoke the protection of section 704(a) for conduct aimed at achieving purely ulterior objectives, or for conduct aimed at achieving even proper objectives through the use of improper means, could have an effect directly contrary to Congress' goal, by discouraging employers from hiring persons whom the Act is designed to protect. The standard can be little more definitive than the rule of reason applied by a judge

or other tribunal to given facts. The requirements of the job and the tolerable limits of conduct in a particular setting must be explored. The present case, therefore, raises the question, put simply, of whether plaintiff went "too far" in her particular employment setting.

 This approach is consistent with that taken by other courts when interpreting section 704(a). In *EEOC v. Kallir, Philips, Ross, Inc.*, 401 F.Supp. 66 (S.D.N.Y., 1975), a case cited by both parties, the plaintiff was discharged for discreetly obtaining from a customer of her employer a written description of her job which had been requested by the New York City Commission on Human Rights during its investigation of the employee's charge of sex discrimination. Stressing the broad language of section 704(a) protecting an employee for assisting "in any manner" with a proceeding under Title VII, the court held that plaintiff's solicitation of the letter was protected. Noting that plaintiff's action had no negative effect on the client relationship, the court observed:

> "Under some circumstances, an employee's conduct in gathering or attempting to gather evidence to support his charge may be so excessive and so deliberately calculated to inflict needless economic hardship on the employer that the employee loses the protection of section 704(a), just as other legitimate civil rights activities lose the protection of section 704(a) when they progress to deliberate

**6.** Plaintiff and the EEOC in its *amicus* brief seemingly reject a balancing test and argue instead that section 704(a) immunizes any employee conduct which is arguably relevant to an employee's opposition to employer discrimination. The negative impact of such conduct on the employer, plaintiff observes, is a necessary and unavoidable consequence of the statutory scheme. We doubt that Congress meant to go this far, particularly because an employee who feels that his employer has violated his rights under Title VII may pursue specific state and federal legal remedies for discrimination and need not rely on vigorous internal action directed against the employer. This conclusion is reinforced by comparing the Title VII procedures with those under the National Labor Re-

lations Act (NLRA). The NLRA allows an employee to engage in "concerted activity" to organize his co-workers, 29 U.S.C. § 157, and courts have recognized approvingly that unionization often depends on constant self-help activity since employees have no specific legal remedies to achieve their objective. Despite this broad reading of "concerted activity", however, courts employ a balancing test in the labor cases to determine whether employee organizing activity has gone too far. *See* discussion, *infra.* Thus, we find it entirely appropriate to utilize a similar balancing test to determine whether an employee's opposition to employer discrimination in the Title VII context has gone too far.

and unlawful conduct against the employer."

*Id.* at 71–72. The Supreme Court too has made passing reference to the limits of protected conduct under section 704(a), stating that an employer may properly deny employment to a former employee who participated in an unlawful "stall-in" to protest the employer's civil rights record. "Nothing in Title VII compels an employer to absolve and rehire one who has engaged in such deliberate, unlawful activity against it." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 803, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1972). In *Ammons v. Zia Co.,* 448 F.2d 117 (10th Cir., 1971), a case somewhat similar to this one, the employer discharged a female employee who had a long history of complaining that her low salary was based on her sex, and who had violated numerous work rules. The employer admitted that its decision to discharge the plaintiff was based partially on the frequency of her complaints of underpayment but denied that the underlying allegation of sex discrimination influenced its decision. The tenth circuit declined to disturb the district court's finding that "[p]laintiff was discharged because of a series of incidents, not related to her sex . . . ." *Id.* at 121. *See also Fogg v. New England Telephone & Telegraph,* 346 F.Supp. 645 (D.N.H.1972). These cases support the principle that in determining whether conduct is protected opposition, a court must balance the setting in which the activity arises and the interests and motivations of both employer and employee. *Compare Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998 (5th Cir., 1969) *with EEOC v. C. & D. Sportswear Corp.,* 398 F.Supp. 300 (M.D.Ga., 1975).

Cases discussing limitations upon the right of union employees to engage in "concerted activity" against their employer provide a helpful point of comparison. Even if the ends sought to be achieved by the employees are protected by the National Labor Relations Act, the means chosen by the employees may be excessive. For example, in *NLRB v. Local 1229, IBEW, (Jefferson Standard Broadcasting Co.),* 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed.2d 195 (1953), the Court reinstated the Board's order upholding an employer's discharge of nine employees for distributing during lawful picketing handbills accusing the employer television station of not serving the public interest. Stressing that the handbills were not tied directly to the on-going labor dispute, but rather were a direct attack on the employer's business, the Court found the discharge justified, observing "[t]here is no more elemental cause for discharge of an employee than disloyalty to his employer." *Id.* at 472, 74 S.Ct. at 176. *See also McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 803 & n.17, 93 S.Ct. 1817 (1973). Moreover, the Court concluded that even if the subject of the handbills was protected "concerted activity" under section 7, "the means used by the technicians . . . have deprived [them] of the protection of that section . . . ." *NLRB v. Local 1229, IBEW, supra,* 346 U.S. at 477–78, 74 S.Ct. at 179; *see* 29 U.S.C. § 157. We recently had occasion to decide whether an employee's activity designed to protect the interests of the union could form the basis for his discharge on the ground that it harmed the employer's interest. *See NLRB v. Circle Bindery, Inc.,* 536 F.2d 447 (1st Cir., 1976). Although we deferred to the Board's conclusion that the employee should be reinstated because he acted "solely to ensure the proper use of the union bug," *Id.* at 453, we recognized the need to consider the extent of the harm to the employer, the employer's interests in preventing the employee's activity and the form of the concerted activity.

Other labor cases defining the bounds of concerted activity protected under section 7 of the National Labor Relations Act, 29 U.S.C. § 157, similarly have refused to accord a privilege to disloyal and insubordinate conduct. *See, e. g., NLRB v. Red Top, Inc.,* 455 F.2d 721 (8th Cir., 1972) (employee's threat to take complaints to employer's customer a disloyal act designed to harm employer and supports employee's discharge); *Boaz Spinning Co. v. NLRB,* 395 F.2d 512 (5th Cir., 1968) (employee's deliberate defiance of employer's rules limiting

employee's right to speak at plant meeting constitutes insubordination and justifies discharge); *cf. Meehan v. Macy,* 129 U.S. App.D.C. 217, 392 F.2d 822 (1968) (right of federal employee to petition Congress for redress of grievance does not embrace right to, appeal generally to other sympathizers urging them to write their Congressmen on employee's behalf).

■ Under the principles of the labor cases, the district court was entitled to conclude that Dr. Hochstadt's actions went beyond the scope of protected opposition because they damaged the basic goals and interests of the Foundation. An employer has a legitimate interest in seeing that its employees perform their work well. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the employment setting at the Foundation, the employer had a particular interest in maintaining a harmonious and congenial working environment conducive to the interchange of ideas and the sharing of research. The district court was entitled to find that Dr. Hochstadt's constant complaints to colleagues damaged relationships among members of the cell biology group and sometimes even interfered with laboratory research. Even if justified, they occurred upon some occasions when the employer was entitled to expect her full commitment and loyalty. Section 704(a) does not afford an employee unlimited license to complain at any and all times and places.

■ Dr. Hochstadt committed, moreover, acts of disloyalty to the Foundation, for which she cannot properly claim immunity. In this category were her assertions to others that the Foundation was in jeopardy of losing its federal grant money—remarks that understandably aroused the concern of scientists at the Foundation because they raised the spectre of the sudden collapse of the institution for lack of funding. Also in the category of disloyal and damaging acts would be Dr. Hochstadt's challenge to Dr. Welsch in May, 1975, to take sides in her on-going dispute with Dr. Hoagland.

This could be seen as an attempt to divide the administration, an act which, if successful, could have resulted in institutional chaos. The district court also observed that "her unauthorized disclosures of Foundation's confidential matters . . . injur[ed] the Foundation and jeopardiz[ed] its fund-raising efforts."

■ There is some suggestion in Dr. Hochstadt's brief that the labor cases defining the scope of concerted activity under 29 U.S.C. § 157 may be inapposite because of differences in the purposes of the National Labor Relations Act (NLRA) and of the Civil Rights Act. Observing that the NLRA exists to promote resolution of employment disputes through private negotiation and bargaining, she argues that concerted activity properly covers only conduct aimed at achieving equal bargaining power. On the other hand, section 704(a) protects opposition to employment discrimination not to encourage private settlement, according to Dr. Hochstadt, but rather to foster the complete eradication of all forms of discrimination. She concludes therefore that the broad purpose of Title VII contemplates greater initiative and participation of individuals in the enforcement process than does the NLRA. We do not agree. The purpose of the NLRA, to stimulate employee organizing activity and collective bargaining, requires that employees possess wide latitude to communicate with one another and their employers, and this protection can scarcely be narrower than the protection accorded an employee who "has opposed any practice made an unlawful employment practice . . . ." In any event, the competing interests that weigh against granting employees carte blanche protection are the same in the NLRA and Title VII contexts: the employer's right to run his business must be balanced against the rights of the employee to express his grievances and promote his own welfare.

■ Keeping in mind the legitimate interests both of Dr. Hochstadt and the Foundation, we face the ultimate question,

whether the district court could properly on this record determine that Dr. Hochstadt "went too far" in her activities and deportment. We think it could. A permissible interpretation of the evidence was that the Foundation had wiped the slate clean in December, 1974, after its settlement with Dr. Hochstadt, and that the administration was willing to accept her as a member of the team. But Dr. Hochstadt's extreme hostility toward Dr. Welsch, Dr. Gibbons,[7] and Dr. Hoagland in response to the April, 1975, evaluation indicated that there would be no change in her attitude or her behavior from that encountered since she was hired in 1972. The continuation of the general conflict forced the Foundation to make a critical choice: either it would retain Dr. Hochstadt and tolerate not only her complaints against the Foundation but also the complaints against Dr. Hochstadt's behavior raised by other scientists and research personnel, or it would terminate her employment. We cannot disagree with the district court's conclusion that the Foundation was justified in choosing the latter course. Dr. Hochstadt's actions over the previous three and one-half years demonstrated that her colleagues and other necessary personnel could not work successfully with her: research assistants in her laboratory were unhappy and left the Foundation; senior scientists in the cell biology group complained that her behavior impeded their research, and several sought her resignation; and the director and assistant director had found it impossible to reach any compromise with Dr. Hochstadt. Dr. Hoagland had shown

patience in dealing with Dr. Hochstadt in the past, warning plaintiff repeatedly that her actions might cause her discharge and declining to recommend her dismissal in 1974 despite inquiries by the Foundation's trustees, but an employer is entitled to lose his patience at some point. See Frockt v. Olin Corp., 344 F.Supp. 369 (S.D.Ind., 1972). Based on this pattern of conflict, the district court could reasonably conclude that the Foundation's decision to discharge plaintiff was based on legitimate and non-discriminatory reasons and did not infringe on her rights under Title VII.[8] Although Dr. Hochstadt's actions were associated with a protected objective, the district court reasonably concluded that they constituted serious acts of disloyalty, which damaged the employer's interests and were of an excessive nature which was not warranted as a response to any conduct of the Foundation. Accordingly, the district court did not err in holding that the discharge had a sufficient and nondiscriminatory basis.

*Affirmed.*

---

7. Because Dr. Gibbons was the EEOC officer at the Foundation, there is some merit in the plaintiff's argument that she was entitled to show a high degree of hostility towards the Foundation in her conversation with Dr. Gibbons charging that her low evaluation was discriminatory. Even assuming, however, that a higher degree of protection attaches to an employee's contacts with her employer's EEOC officer, Dr. Hochstadt's hostile confrontation with Dr. Welsch, the assistant director of the Foundation, must be judged against the normal standard for protected opposition, and that confrontation, the precipitating factor of her discharge, went beyond the scope of protected activity.

8. Because we find adequate support for the district court's conclusion that the Foundation discharged Dr. Hochstadt for legitimate and nondiscriminatory reasons, we have no occasion to consider whether a discharge based on several reasons, at least one of which is impermissible under section 704(a), violates an employee's rights. See NLRB v. Fibers Int'l Corp., 439 F.2d 1311 (1st Cir., 1971). The mere establishment of a prima facie case of a violation of section 704(a) does not compel the conclusion that the discharge was based in some part on impermissible grounds assuming the defendant employer satisfies the court, as here, that the actual reasons were legitimate ones.