818 F.2d 363
 43 Fair Empl.Prac.Cas. 1727,
43 Empl. Prac. Dec. P 37,177
Victoria A. SMITH on behalf of herself and all others
similarly situated, Plaintiff-Appellant,
v.
TEXAS DEPARTMENT OF WATER RESOURCES, et al., Defendants-Appellees.
 No. 85-1453.
 United States Court of Appeals,
Fifth Circuit.
 June 3, 1987.
 
 1
 Sheila S. Asher, Stephen Greenberg, Martin, Cox & Greenberg, Austin, Tex., for plaintiff-appellant.
 
 
 2
 Carla M. Crisford, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Lawrence J. King, Asst. Atty. Gen., Austin, Tex., for defendants-appellees.
 
 
 3
 Appeal from the United States District Court for the Western District of Texas.
 
 
 4
 Before REAVLEY and POLITZ, Circuit Judges, and KAZEN*, District Judge.
 
 KAZEN, District Judge:
 
 5
 Upon initial appeal, we vacated the judgment in favor of the Defendants and remanded to the district court for more specific findings. Smith v. Texas Dept. of Water Resources, 799 F.2d 1026 (5th Cir.1986) (Smith I ).
 
 
 6
 In Smith I, we recited in some detail the evidence developed at the trial of the case, and observed that this evidence "obviously could lead to sharply conflicting conclusions." 799 F.2d at 1029. We suggested that the decision as to which conclusions should be reached would require the resolution of several key fact questions. Id. The trial court has now made supplemental findings of fact and conclusions of law, essentially resolving all key fact disputes in favor of the Defendants and reaffirming the conclusion that Plaintiff failed to establish her cause of action.
 
 
 7
 The trial court has now found that in January, 1983, C.R. Baskin, Director of the Data and Engineering Services Division of the Texas Department of Water Resources ("TDWR"), requested that Plaintiff Smith provide secretarial relief twice daily, one half-hour in the morning and again in the afternoon and reminded her that her job description required her to "assist in other division programs as needed"; that Bill Caskey, the Assistant Director of the Division, "routinely performed" daily relief services for Baskin's secretary during the afternoon mail run; that during the period in question TDWR was experiencing budgetary cutbacks and a 20% reduction in personnel which required Baskin to look for more efficient, flexible means of relieving the secretaries; that the decision to add secretarial relief duties to Smith's regular duties was within Baskin's discretion and not violative of TDWR policies; that Smith was specifically advised that her refusal to accept this work assignment would be grounds for termination; that Smith failed to report as instructed; that Charles Nemir, Executive Director of TDWR, told Smith that if she would assist Baskin as requested, Nemir would instruct the personnel office to find Smith a lateral transfer to a technical position in a division where she would not be required to do secretarial relief; that Smith refused this offer; that a male predecessor of Smith's failed on several occasions to adequately perform routine tasks in the map room, but that TDWR did not consider him "insubordinate" for those failures and that he was not disciplined for them; and that performance by Smith of the requested relief duties would not have adversely affected her job evaluations.
 
 
 8
 Findings of fact shall not be set aside on appeal "unless clearly erroneous." Fed.R.Civ.P. 52(a). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The trial court's findings "cannot be clearly erroneous" when they constitute a choice between "two permissible views of the evidence." Id. at 574, 105 S.Ct. at 1512. If the trial court's version of the evidence is "plausible," this Court may not reverse. Id. This standard requires us to "extend great deference to the district court's findings." Hamilton v. Rogers, 791 F.2d 439, 442 (5th Cir.1986). After a thorough review of the evidence, we are persuaded that, while this case could easily have been decided differently, the trial court's findings cannot be considered an implausible view of the evidence.
 
 
 9
 It is clear that Smith was directed to perform secretarial relief work for Baskin and refused to do so despite at least two warnings that a refusal would result in termination. She chose this act of insubordination in lieu of complying with the order and challenging it through proper legal procedures.[1] When Smith discussed her proposed termination with Charles Nemir, the Executive Director of TDWR, he explained to her the need for management flexibility in meeting the budgetary and personnel problems which had developed. He proposed that if Smith would accept the relief assignment, every effort would be made to relocate her to a similar position in the department, where she would not have to perform the unwanted duties. Smith refused this offer.
 
 
 10
 We cannot agree that the opposition clause, 42 U.S.C. Sec. 2000e-3(a), protected Smith in this situation. This is not a case where Smith was terminated for filing a charge or complaint under Title VII. As indicated in note 1, supra, had she accepted the assignment and then filed a proper complaint, she clearly would have been protected against retaliation. Nor is this a case where Smith was terminated for picketing activities or other complaints of discrimination, as in Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130 (5th Cir.1981), cert. denied 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982) and Armstrong v. Index Journal Co., 647 F.2d 441 (4th Cir.1981), the cases cited by the dissent.
 
 
 11
 While Payne involved picketing and boycott activities, Armstrong is factually closer to the instant case. There, the plaintiff was a salesperson who had been persistently complaining about a separate job classification reserved for women only, a lower base pay than males, and assignment of certain types of accounts to her. At one point, she resisted accepting a specific account and asked what would be the consequences of her refusal. She was assured that she would not be fired and that the account would be transferred to another salesperson, a practice routinely followed by the employer. Nevertheless, she was subsequently fired. The court found that the firing was not due to any isolated incident but was rather "the culmination of her persistent complaints." 647 F.2d at 448. These complaints pertained to a variety of discriminatory practices between males and females. The court also noted that it would not have been extraordinary for the employer to simply transfer the undesired account to another person, and yet no effort was made to do so. By contrast, in this case it was entirely plausible to find that Smith's employer did not use her refusal to accept the job assignment as a pretext to fire her for previous complaints of discrimination, and also to find that Smith rejected efforts to seek a solution to the problem.
 
 
 12
 Both Payne and Armstrong affirm, moreover, that not all activity purportedly done in opposition to perceived unlawful employment practices is protected by the opposition clause. Thus Payne acknowledged that there are instances "where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed," which conduct is not protected. 654 F.2d at 1142. Armstrong stressed that the opposition clause "was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work." 647 F.2d at 448. Both opinions rely upon the seminal opinion in Hochstadt v. Worcester Foundation for Experimental Biology, 545 F.2d 222 (1st Cir.1976). Drawing upon legislative history reflecting that management prerogatives are to be left undisturbed to the greatest extent possible, Hochstadt held that an employee is not immune from discharge merely by claiming that she was opposing discriminatory practices, and that an employer remains entitled to loyalty and cooperativeness from employees. 545 F.2d at 230. The court specifically rejected an argument that the opposition clause immunizes any employee conduct arguably relevant to the employee's opposition to discrimination:
 
 
 13
 "We doubt that Congress meant to go this far, particularly because an employee who feels that his employer has violated his rights under Title VII may pursue specific state and federal legal remedies for discrimination and need not rely on vigorous internal action directed against the employer."
 
 
 14
 545 F.2d at 231 n. 6.
 
 
 15
 We have heretofore adopted a balancing test, derived from Hochstadt, requiring the employee's conduct to be reasonable in light of the circumstances and balancing the employer's right to run his business against the right of the employee to express grievances and promote her own welfare. Jones v. Flagship International, 793 F.2d 714, 728 (5th Cir.1986); Payne, 654 F.2d at 1142; Jefferies v. Harris Cty. Community Action Ass'n, 615 F.2d 1025, 1036 (5th Cir.1980). Employing this balancing test, we find Smith's conduct to be unreasonable in light of the circumstances. She refused to perform a specific job assignment despite being asked more than once to do so under penalty of termination. While the assignment was obviously unpalatable to her, it was certainly not immoral, degrading, or dangerous to her health. Compare Meyer v. Brown & Root Const. Co., 661 F.2d 369 (5th Cir.1981). It had no immediate adverse effect on her salary or other terms of employment. She simply assumed that the relief work would involve more than the stipulated 30 minutes per half-day. She rejected an offer to accept the position temporarily while other arrangements could be made, and spurned any recourse to available legal processes. We do not think Congress intended the opposition clause to protect this form of self-help.
 
 
 16
 Smith contends that she was terminated for insubordination while a previous male employee, Gutierrez, was not. The evidence in this regard, however, is not persuasive. Gutierrez had worked under Emil Blomquist in the Topographic Mapping Section on some earlier occasion. Blomquist cited an occasion when Gutierrez failed to comply with a directive to put a special type of stamp on certain maps and inventory tags on others. He was not disciplined in any way. Blomquist was told by his superiors to handle the incident himself. Blomquist conceded that Gutierrez was a non-probationary employee, making it more difficult to terminate him under department policies,[2] and that Blomquist never recommended that Gutierrez be terminated for this conduct. Bobbie Ray Critendon, Blomquist's superior, characterized the problems with Gutierrez as being minor and more a result of laziness rather than insubordination. The evidence fails to indicate that Gutierrez' conduct was comparable to Smith's.
 
 
 17
 Smith also relies upon evidence that only she and her immediate female predecessor were ever asked to do relief secretarial work, while males previously employed as an Engineering Aide III in Topographic Mapping were not given that extra assignment. However, Nemir explained that the department had been under some budgetary pressures and had incurred staff reductions making it necessary to be flexible in order to accomplish its tasks within the allotted resources. He explained that Smith's position was "not a high priority job," and that in utilizing their resources most efficiently, the department would transfer people from areas where the individuals could be more easily spared. It should be noted that the Topographic Mapping Section was not a large one. It consisted of Blomquist and one aide. The position was not even filled when Smith left. Smith and her immediate predecessor were female aides while the prior aides were males. This is not a case where Smith was selected from among other male aides to do relief secretarial work. Asked why Smith's male predecessors had not been asked to do other duties, Nemir stated that the situation requiring assignment changes had not developed previously. Blomquist, an ardent witness for Smith, conceded that Baskin had attempted to rotate secretaries to handle relief work prior to asking for Smith's assistance, but had found this procedure unsatisfactory.
 
 
 18
 Smith also urges that the direct assignment of duties to her by Baskin was in violation of department policies and that the decision to fire her without consulting her immediate supervisor, Blomquist, was also irregular. Again, however, while there is some support for her position, the evidence is mixed. Thus Blomquist testified that Baskin first consulted him about the desire to have Smith do secretarial relief work. Blomquist objected to the proposal, stated that he did not wish to relay this assignment to Smith, and asked Baskin to handle it directly. Personnel Director Gary Otting opined that the proposed assignment of Smith was within her job description and did not constitute a unilateral rewriting of the job description by Baskin. Critendon added that Baskin would have had authority to change the job description anyway. Critendon also testified that Smith's performance of part-time work for Baskin would not have adversely affected her future evaluations because she would have been evaluated on the basis of the type of job or jobs she was performing and that Baskin himself would have had the opportunity to review and comment upon her evaluations.
 
 
 19
 To recite the foregoing evidence is not to gainsay the existence of contrary evidence. It does, however, illustrate that the trial court's findings reflect a permissible or plausible view of the evidence and thus cannot be declared "clearly erroneous." Because those findings support the ultimate conclusion, the judgment is AFFIRMED.
 
 POLITZ, Circuit Judge, dissenting:
 
 20
 Because I am persuaded beyond peradventure that the district court should be reversed, I respectfully dissent. The treatment accorded Victoria Smith by Charles Baskin, Division Director, was undeniably sexually based and motivated. I understand that by adopting Title VII Congress acted to proscribe that sort of gender-based discrimination towards employees. Notwithstanding, today we have permitted such.
 
 
 21
 The majority correctly notes that the "clearly erroneous" standard restrains a reviewing court from reversing the trier of fact "simply because it is convinced that it would have decided the case differently." Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985). But the courts of appeals have not been made into courts of legal error only. To do so would require a rule change. Fed.R.Civ.P. 52(a).
 
 
 22
 The time-honored standard teaches that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948). Anderson teaches further, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574, 105 S.Ct. at 1512, 84 L.Ed.2d at 528. But Anderson does not supplant our duty to conduct "a comprehensive review of the entire record," Id., 470 U.S. at 581, 105 S.Ct. at 1515, 84 L.Ed.2d at 533 (Powell, J., concurring); Parker v. Mississippi State Department of Public Welfare, 811 F.2d 925 (5th Cir.1987). As we recently stated in Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1044 (5th Cir.1987), "Congress surely did not intend Rule 52(a) to constrict as a Victorian corset, binding the courts of appeals to the findings of the district court absent a careful and fitting examination."
 
 
 23
 Victoria Smith was a secretary. She was a good secretary but she had higher aspirations, as she viewed them, and desired to move into the technical field. She saw an opening for an Engineering Aide III and applied for the job, even though it meant a substantial pay cut. Before accepting the job, she made certain that it was a technical job with no secretarial-type duties. She was assured of that.
 
 
 24
 She performed her work well. Her first-line supervisor, Gustav "Emil" Blomquist, testified that she was a fine employee. Her second-line supervisor, engineer Bobbie Ray Critendon, gave her high marks, finding her to be a fast study who was "becoming an outstanding employee" in her new, technical assignment as an Engineering Aide III in the Topographic Mapping Section.
 
 
 25
 Notwithstanding the assurances given Victoria Smith when she transferred jobs at a pay cut, and despite the fact that her job description called only for non-technical duties, Charles Baskin decided that she would, on a permanent basis, relieve his secretary in the morning and again in the afternoon. To this we would add, and whenever else she might be needed, if the past was any indication of the future. Ms. Smith was understandably chagrined and reluctant. Her immediate supervisor was opposed to the assignment; he neither recommended that she accept it nor did he order it. The Personnel Director, Gary L. Otting, found the assignment inconsistent with her job description.
 
 
 26
 Director Baskin worked his will. He decreed that Victoria Smith would either do the secretarial duties he assigned or she would be fired. The entire process was prestructured. On January 17 Smith was given a memo from Baskin telling her to report for secretarial relief duties on January 20, "or else." Simultaneously, on January 17 the papers terminating Smith were prepared and signed by the Personnel Director, Baskin, and Charles E. Nemir, Executive Director of the Texas Department of Water Resources. Ms. Smith was in fact discharged before the time arrived for her to perform.
 
 
 27
 The defendant offered no witnesses although the pretrial order lists Baskin as a witness. He was not called nor did he testify by deposition. One has to ask why. He was the person responsible. Methinks his silence indicates that Baskin had no non-gender-based reason for his action and his superiors well knew it.
 
 
 28
 Did defendant articulate a legitimate business reason? Was there really an employee RIF or other crunch requiring people to pull in their belts? If so, this record doesn't show it. The trial court and majority conclude that Baskin's demand on Victoria Smith was just reflective of hard times. But was it?
 
 
 29
 According to uncontradicted testimony, only two people were ever taken out of the Topographic Mapping Section and made to relieve Baskin's personal secretary--Victoria Smith and her female predecessor, Amy Nevarez. Ms. Nevarez, like Ms. Smith, was hired as an Engineering Aide III in the Topographic Mapping Section. Unlike Ms. Smith, Amy Nevarez had no secretarial skills. Unable to type, she had to "hunt and peck" to complete labels for the maps. Nonetheless, she was a female, and apparently because Baskin believed females are supposed to be secretaries, he ordered her to relieve his secretary.
 
 
 30
 The assignment for Ms. Nevarez lasted three to four months, apparently until she transferred to another division. The time was originally supposed to be 30 minutes in the morning and 30 minutes in the afternoon. That didn't last long, as Nevarez testified:
 
 
 31
 I was told it was going to be 30 minutes in the morning and 30 minutes in the afternoon, then it would be an hour, and then it got to be days.... The ladies would go away on vacation and I would stay there for three days, whole days.
 
 
 32
 Most telling of all, no male Engineering Aide III was ever called to relieve Baskin's secretary. Even if hard times did require a fill-in from the technical staff, no male, even one who could type, was ever considered for the job. In the myopic, gender-prejudiced eye of division director Baskin, being a secretary is not a male duty, it is exclusively in the domain of the ladies.
 
 
 33
 The trial court found that males routinely relieved Baskin's secretary. The record lends no support to that finding. Bill Caskey was Baskin's assistant. Caskey's desk was next to Baskin's secretary; in fact she was secretary for both of them. Caskey performed the "routine" male relief work that the trial court found so significant. It appears that on some afternoons when Baskin's secretary left the office for a few minutes around 4:30 p.m. to take late mail to the mailroom, Caskey answered the telephone if it rang. Bully for Caskey!
 
 
 34
 I am not persuaded that the defendant articulated a legitimate business reason for Baskin's actions, but even if it did, the evidence overwhelms that it was pretextual. I read this record as reflecting a classic example of "backing and filling."
 
 
 35
 Smith was discriminated against because of her sex. She was ordered to do a job because of her sex. She was reluctant, but never specifically declined. Each time she was approached she demurred and asked for more time to think about it. Nonetheless she was fired, ostensibly for insubordination. Moreover, despite this "insubordination," remarkably her record was marked that she was eligible for rehiring. The Personnel Director knew of no other person who was ever fired who was also marked for rehire by the agency, nor did the Personnel Director know of any other termination where, as here, the first-line and second-line supervisors were not involved in the decision.
 
 
 36
 Baskin is no longer with the agency. Dr. Tommy Ray Knowles is the new Division Director. His secretary is relieved daily by other secretaries. No technical people, male or female, are pulled from their jobs. This demonstrates to me the clearly erroneous nature of the trial court's conclusion that "Ms. Smith failed to present any evidence establishing that her selection as the person to do the secretarial relief work in Mr. Baskin's office was based on her sex."
 
 
 37
 Moreover, the trial court erred in its application of Title VII, finding that Baskin could discriminate against Smith simply because she was a new, "probationary," employee. Curiously, the court found that, "[h]ad Defendant desired to discriminate against women, it simply would not have hired Plaintiff." This ignores the statute and vast body of caselaw recognizing discriminatory acts and practices outside the hiring process. 42 U.S.C. Sec. 2000e-2.[1]
 
 
 38
 The evidence is undeniable that because of her sex Baskin assigned the secretarial duties to Smith, rather than any other technical employee. This violates Title VII. See Futran v. RING Radio Co., 501 F.Supp. 734, 741 (N.D.Ga.1980) (Radio station violated Title VII by asking female talk show host "to add to her job essentially clerical duties that males were not similarly requested to perform and in the retaliatory termination of her employment when she protested the assignment of clerical duties as discriminatory.")The defendant would make much of the fact that Smith was discharged because she refused an assignment. Counsel argued that she should have worked as ordered and then complained. That argument misperceives Title VII. The fact that Smith did not cheerfully accede to improper demands is of no moment because Title VII proscribes the demands themselves. Moreover, Smith was protected under the opposition clause of section 704(a), 42 U.S.C. Sec. 2000e-3(a), which proscribes retaliation against employees who oppose their employer's unlawful employment practices:
 
 
 39
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this title....
 
 
 40
 See Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130 (5th Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir.1981). In Payne we concluded that a plaintiff claiming opposition need not prove that the practice she opposed was indeed unlawful, just that plaintiff had a reasonable belief that it was unlawful. An employee who resists unlawful conduct may not be sanctioned for that resistance. Congress apparently thought that to permit such would turn Title VII on its head. I totally agree.
 
 
 41
 The majority distinguishes this case from Payne and Armstrong by claiming that Baskin fired Smith because she rejected efforts to "seek a solution to the problem," and not because she complained of his discriminatory acts in forcing her to accept secretarial duties. The proffered solution consisted of a vague suggestion that Smith would be transferred from the secretarial duties as soon as possible. If the past was any indication, she would have been performing secretarial duties for Baskin indefinitely. I understand the opposition clause to bar an employer from firing a person because she objected to a discriminatory job assignment.
 
 
 42
 Nor is this a case where, as the majority suggests, Smith's conduct so interfered with her legitimate duties that she became ineffective in the job for which she was employed. See Payne. Smith's reluctance to accept the secretarial duties amounted to silent opposition. This was not "insubordinant, disruptive, or nonproductive behavior" by any measure. See Armstrong.
 
 
 43
 Moreover, Smith should not now be penalized for not filing an immediate claim with the EEOC. I do not expect an aggrieved employee to act with the legal skills of a lawyer acting with the benefit of hindsight.
 
 
 44
 I am persuaded that under our appellate responsibilities, as defined by Rule 52(a) and Anderson and other cases, unless we are ready to abandon all appellate factual review, we should reverse in this case. The trial court's factual findings are clearly erroneous. Further, it erred in its application of the law. Victoria Smith could not be fired for declining to accept gracefully that which Title VII forbade her employer to do, i.e., discriminate against her because of her sex. I disagree with my brothers of the majority and respectfully dissent.
 
 
 
 *
 District Judge of the Southern District of Texas, sitting by designation
 
 
 [1]
 Title VII of the Civil Rights of 1964 makes it an unlawful employment practice for an employer to discriminate against any individual with respect to her terms or conditions of employment, because of such individual's sex. 42 U.S.C. Sec. 2000e-2(a)(1). Although Smith urges that the acceptance of part-time secretarial duties would have eventually affected her future advancement, there is little evidence to support that proposition. Nevertheless, the foregoing provision is not limited to "economic" or "tangible" discrimination. It strikes at "the entire spectrum of disparate treatment of men and women." Meritor Savings Bank, FSB v. Vinson, --- U.S. ----, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). See also Jones v. Flagship Intern., 793 F.2d 714 (5th Cir.1986). Thus, Smith could have accepted the assignment and then challenged it as discriminatory. Such a challenge would have been protected from retaliation. 42 U.S.C. Sec. 2000e-3(a)
 
 
 [2]
 Even if an employee's probationary status would make it easier to discharge her under department policies, it would not justify a discharge motivated by a discriminatory animus. See Smith I, 799 F.2d at 1031
 
 
 [1]
 Similarly, the majority's conclusion that Smith should have accepted the assignment and then complained does not accord sufficient weight to the fact that Baskin violated Title VII not only when he fired her, but when he first demanded that she accept secretarial duties