William C. KING, Plaintiff,

v.

ILLINOIS BELL TELEPHONE COMPANY, an Illinois Corporation, Defendant.

No. 77 C 3392.

United States District Court, N. D. Illinois, E. D.

Oct. 4, 1978.

Robert S. Bailey, James R. Bellman, Chicago, Ill., for plaintiff.

L. Bow Pritchett, Thomas H. W. Sawyer, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

MARSHALL, District Judge.

This is a civil rights action brought by the plaintiff, William King, against his former employer, Illinois Bell Telephone Company under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* King's complaint alleges that the company violated Section 704(a) of the Act, 42 U.S.C. § 2000e–3(a), when it discharged King and refused to rehire him in retaliation for his participation in a picket line protesting Illinois Bell's racial practices. In his prayer for relief, King requests reinstatement, back pay and benefits, and all other appropriate relief. Jurisdiction is conferred by

42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1343(4). In its motion to dismiss King's complaint, Illinois Bell argues that (1) Section 704(a) does not protect work stoppages in violation of a collective bargaining agreement; (2) that plaintiff's complaint lacks the necessary jurisdictional allegations to state a claim for relief under Title VII;[1] and (3) that plaintiff's action is barred by laches. Additionally, Illinois Bell has filed a motion to strike certain exhibits attached to plaintiff's memorandum of law.

According to the allegations of the complaint, plaintiff was hired as a draftsman by defendant in January, 1969. On May 4, 1970, a group of black employees presented a list of grievances to defendant's representatives. These grievances contained numerous allegations of racial discrimination by defendant. The employees refused to return to work until their grievances were resolved. As a consequence, they were suspended from their positions with defendant. In response to their suspensions, the group formed a picket line outside of defendant's corporate headquarters in Chicago. Up to this point William King was not involved in the activities.

On May 5, 1970, King and other employees, both black and white, joined the picket line. The picketing occurred during working hours. Two days later, King represented the demonstrators as their spokesperson in a meeting with defendant's officials, who warned King that the demonstrators would be fired if they did not return to work. According to the collective bargaining agreement between the employees' union and defendant, work stoppages were expressly prohibited and each party had the

---

1. The complaint alleges that plaintiff has the right to sue pursuant to 42 U.S.C. § 2000e–5. It alleges that he filed charges with the EEOC, which reached the merits of his complaint and unsuccessfully attempted to effect a conciliation with Illinois Bell. The fact that the EEOC reached the merits implies that the timeliness requirements for filing charges with the EEOC were satisfied. The complaint alleges facts which indicate that the complaint was filed 91 days after the date the EEOC's right to sue letter was issued. Since the 90-day filing requirement of § 2000e–5(f)(1) begins to run only after actual notice of the right to sue letter has been received by the complainant, the allegations permit an inference that less than 90 days transpired between receipt and filing. The allegations therefore survive a motion to dismiss. They may be pierced by a subsequent motion for summary judgment, however, if plaintiff decides to submit an amended complaint which satisfies the standards set forth *infra.*

power to discipline violators of this provision.[2]

On May 11, 1970, King and other demonstrators were terminated as employees of Illinois Bell. Approximately one month after their termination, King and other terminated employees, acting at the request of defendant, returned to be considered for re-employment. Eight of the fifteen employees who returned were re-hired. King was not. In explaining this decision, Illinois Bell stated that King was a poor worker and had a poor attitude. King, however, alleges that these reasons were false and racially motivated, and that Illinois Bell's refusal to re-hire him was caused by his participation in the work stoppage and picketing. King further alleges that his participation in these activities was protected under Section 704(a) from any form of employer retaliation or discrimination. Thus, we come to the issue presented by this case: whether a work stoppage by union members, during working hours to protest an employer's alleged racial discrimination in employment practices, is protected by Section 704(a), even though the work stoppage contravenes a collective bargaining agreement between the company and the employees' union.

■■■ This issue raises significant questions concerning the interplay and accommodation of important policies embodied in the National Labor Relations Act, 29 U.S.C. § 151 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The former is designed to eliminate economic warfare between employer and employee, such as strikes and lockouts, through the use of collective bargaining and peaceful arbitration of labor disputes. See, e. g., Boys Markets v. Clerks Union, 398 U.S. 235, 243, 90 S.Ct. 1583, 26 L.Ed.2d 199

(1969) and Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). The latter manifests a Congressional intent to achieve equality of employment opportunity by eliminating those practices that discriminate on the basis of race, color, religion, sex or national origin. See, e. g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1973) and Griggs v. Duke Power Co., 401 U.S. 424, 429–30, 91 S.Ct. 849, 28 L.Ed.2d 158 (1969). Before attempting to integrate these policies, we will review the existing boundaries of the protection afforded by Section 704(a).

Section 704(a) provides in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e–3(a).

A cursory analysis of the statute's wording reveals two types of activity which are protected from employer retaliation: one, opposition to employment discrimination, and two, participation in any administrative or judicial proceeding under the Act. For purposes of convenience, the former will be referred to as the "opposition" clause and the latter as the "participation" clause. Plaintiff claims that his actions were within the purview of the opposition clause.

The legislative history of the Act provides no illumination on the parameters of the opposition clause.[3] Consequently, we turn our attention to those cases which have attempted to delineate its contours.

2. Article 30 of the collective bargaining agreement between Illinois Bell and the plaintiff's union states in pertinent part: "It is understood between the parties . . . and the Union agrees that it will not call upon or authorize employees to cease and abstain from the continuous performance of their respective duties with the Company . . . " This article also provides that should an employee abstain from the performance of his or her duties "each of

the parties hereto shall take the necessary steps to discipline properly such employee or employees."

3. See, H.Rep. No. 570, 88th Cong. 1st Sess. 5 (1963); H.Rep. No. 914, pt. 1, 88th Cong. 1st Sess. (1963); H.Rep. No. 914, 88th Cong. 2nd Sess., 2 U.S.Code Cong. & Admin. News, pp. 2355, 2401, 2403 (1964).

■ In *Green v. McDonnell Douglas Corp.*, 463 F.2d 337 (8th Cir. 1972), *vac. on other grounds*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972), plaintiff, a black civil rights activist, was laid off by the defendant during a general reduction in its work force. Green protested his discharge as being racially motivated. As part of this protest, he participated in an illegal "stall-in" on the access roads to the defendant's plant. Shortly after the demonstration, defendant publicly advertised for mechanics, a position for which the plaintiff was fully qualified. Plaintiff promptly applied for re-employment in this position. Defendant refused to rehire the plaintiff because of his participation in the "stall-in." Plaintiff's complaint alleged that the defendant violated both section 703(a) and 704(a) of Title VII in refusing to rehire him. In considering plaintiff's section 704(a) allegation, the *Green* court stated lawful demonstrators who oppose employment discrimination as well as those who complain to the EEOC are protected from employer retaliation by section 704(a). 463 F.2d at 341. Participants in unlawful conduct, however, were held to be outside of the protective umbrella of the opposition clause. 463 F.2d at 341. *See also Bullock v. Mumford*, 166 U.S.App. D.C. 59, 74, 509 F.2d 384, 399 (D.C.Cir. 1975). Thus, the protection afforded by the opposition clause is limited by state criminal laws, assuming that those laws are otherwise valid.

On certiorari, the issue of whether these unlawful protests were protected activities under Section 704(a) was not presented to the Supreme Court. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 797 n. 6, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972).[4] However, in passing, the Court implicitly commented on the limits of section 704(a) as follows: "Nothing in Title VII compels an employer to absolve and rehire one who has engaged in such deliberate, unlawful activity against it." 411 U.S. at 803, 93 S.Ct. at

1825. Thus, we believe it clear that the opposition clause of section 704(a) is limited to lawful activities.

■ Moreover, it appears that even some forms of lawful opposition to alleged employment discrimination may be unprotected. In *Hochstadt v. Worcester Foundation*, 545 F.2d 222 (1st Cir. 1976) a senior scientist at the Worcester Foundation persistently and vociferously complained of alleged sex discrimination being practiced by the Foundation. Her aggressive opposition was so vehement and pervasive that it seriously disturbed her colleagues and disrupted the working environment. The *Hochstadt* court faced the issue of whether lawful opposition to employment discrimination may lose the protection of the opposition clause when it becomes excessively disruptive and upsets the employer's interests in securing loyal and cooperative employees. In resolving this question, the court applied a balancing test which explores the tolerable limits of conduct in each particular employment setting:

> In such instances, we think courts have in each case to balance the purpose of the Act to protect persons engaging reasonably in the activities opposing sexual discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel. 545 F.2d at 231.

The court concluded that plaintiff had gone "too far" and plaintiff's opposition activities had impermissibly damaged the employer's legitimate interests "in maintaining a harmonious and congenial working environment" at the Foundation. 545 F.2d at 233. The *Green* and *Hochstadt* decisions teach us that the opposition clause does not give an employee an unlimited license to complain, but only protects lawful opposition which is deemed reasonable in light of the employment setting and interests at stake.[5]

---

4. In *McDonnell*, the Supreme Court vacated and remanded the case on the issue of the Section 703(a) claim in accordance with its discussion of the order and allocation of proof in a private, non-class action challenging employment discrimination. *McDonnell, supra*, 411 U.S. at 807, 93 S.Ct. 1817.

5. Other courts have had occasion to consider the protection afforded by the opposition clause. In *Bartulica v. Paculdo*, 411 F.Supp.

In the case at bar, Illinois Bell urges that strikes by union members which are held during working hours, and which violate a "no-strike" clause are not within the protection of the opposition clause. Because strikes are an integral part of our labor laws, defendant's argument not only requires a construction of Title VII, but also requires an examination of policies embodied in the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*

A similar factual situation arose in *Emporium Capwell Co. v. Community Org.*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1974). A group of black employees at a department store sought to confront their employer directly, outside of their union's established grievance and arbitration channels, to protest the employer's alleged racial discrimination. The employees picketed the store and distributed handbills urging customers not to patronize the store. The existing collective bargaining agreement between the employer and the employees' union contained a no-strike clause. As a result of their continued protest activities, the employees were fired. A charge was filed on their behalf with the National Labor Relations Board which contended that the protest activity was protected by Section 7 of the National Labor Relations Act, 29 U.S.C. § 157.[6]

The Supreme Court held that Section 7 does not protect activities in protest of racial discrimination which result in fragmentation of the union bargaining unit. 420 U.S. at 70, 95 S.Ct. 977. Two major principles underlay the Court's decision. First, the Court emphasized the significance of the concept of "exclusivity" of the union's representation of all of its members to our national labor policy of fostering collective bargaining. 420 U.S. at 61–65, 95 S.Ct. 977.[7] The Court reasoned that if the principle of exclusivity was ignored:

> The potential for conflict between the minority and other employees in this situation is manifest. With each group able to enforce its conflicting demands—the incumbent employees by resort to contractual processes and the minority employees by economic coercion—the probability of strike and deadlock, is high; the likelihood of making headway against discriminatory practices would be minimal. 420 U.S. at 68–69, 95 S.Ct. at 988.

Additionally, Justice Marshall, speaking for the Court, stressed that the union's bargaining power would be seriously diluted if its status as exclusive bargaining representative were denied. 420 U.S. at 63, 70, 95 S.Ct. 977.

Second, the Court recognized the employer's legitimate interest in bargaining with only one employee group on the issue of employment discrimination. 420 U.S. at 69–70, 95 S.Ct. 977. Simply stated, the employer should not be placed in the position of having to bargain with a number of different employee groups over the same issues. Consequently, in order to protect the collective bargaining process, the Court refused to extend the coverage of Section 7 to include these strike activities. 420 U.S. at 70, 95 S.Ct. 977.

The discharged employees in *Emporium* also argued that their strike activities were protected by the opposition clause of section

392, 397 (W.D.Miss.1976), the district court found defamatory and libelous statements to be outside of the opposition clause. *Cf. Novotny v. Great American Federal S. & L. Ass'n*, 430 F.Supp. 227, 230–231 (W.D.Pa.1977) limiting Section 704(a) to protection of those participating in an administrative or judicial proceeding under Title VII.

**6.** Section 7 guarantees employees "the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or mutual aid or

protection . . . ." as well as the right to refrain from these activities. 29 U.S.C. § 157.

**7.** The "exclusivity" principle is codified in Section 9 of the National Labor Relations Act. Section 9 provides in pertinent part: "Representatives designated or selected for the purposes of collective bargaining by the majority of employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." 29 U.S.C. § 159(a).

704(a) of Title VII. The Court expressly declined to consider this question. 420 U.S. at 71 n. 25, 95 S.Ct. 977. But the Court did state that the employees' rights to be free from employment discrimination,

> Whether they are thought to depend upon Title VII or have an independent source in NLRA, . . . cannot be pursued at the expense of the orderly collective-bargaining process contemplated by the NLRA. 420 U.S. at 69, 95 S.Ct. at 988 (footnote omitted).

It is reasonable to infer that the Court would reject the argument that an employee's section 704(a) right to oppose employment discrimination encompasses the use of work stoppages which are prohibited by the terms of a collective bargaining agreement.

There are additional interests which would be adversely affected by extending section 704(a)'s protection to plaintiff's activities in this case. First, the collective bargaining process would be harmed by the diminution of the value of the union's promise in a no-strike clause. The importance of a valid no-strike agreement to the bargaining process has been repeatedly recognized. *See, e. g., Gateway Coal v. U.M.W.,* 414 U.S. 368, 382, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974) and *Boys Markets v. Clerks Union,* 398 U.S. 235, 247–248, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). If an employer cannot obtain a binding no-strike clause, then his incentive to bargain is decreased. He will be less willing to make concessions during the bargaining process. The end result is that the collective bargaining process would be weakened in its ability to resolve labor disputes.

Protection of strike activity under the opposition clause may also have serious consequences for other employees not involved in the strike. The strike may result in the temporary closing of the employer's business and the displacement of a number of uninvolved employees from their jobs. These employees, who have not been involved in the decision to strike and have obeyed the contractual prohibition on work stoppages, have relied on the binding character of the no-strike clause and have a substantial interest in uninterrupted employment.

■ Accordingly, we hold that the opposition clause of section 704(a) does not protect strikes by union members during working hours in violation of an existing collective bargaining agreement.

■ We emphasize that the substantive right of Title VII to be free from employment discrimination, as opposed to the right to be free from retaliation for asserting that right, is not affected by our holding. An employee who believes he has been discriminated against retains a number of effective remedies in his or her legal arsenal. First, the employee may file charges with the Equal Employment Opportunity Commission.[8] Second, the employee may institute judicial proceedings against his employer if the employee's charge has been denied by the Commission, 42 U.S.C. § 2000e–5(f)(1), or if, after the charge has been before the Commission for one hundred and eighty days, the employee is unsatisfied with the efforts of the Commission, 42 U.S.C. § 2000e–5(f)(1) and 29 C.F.R. 1601.25(c). Third, the employee may utilize the existing grievance and arbitration machinery to resolve his charges. Fourth, the employee may bring a civil rights action against the employer under 42 U.S.C. § 1981, *see, Johnson v. Railway Express Agency,* 421 U.S. 454, 459–460, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). Finally, the employee may engage in various other opposition activities under the protection of section 704(a). We feel that the employee's right to be free from employment discrimination is well protected by the availability of these remedial courses of action.

---

8. The Supreme Court has recognized Congressional selection of the administrative processes of the EEOC as the preferred method of resolving charges of employment discrimination. *See Occidental Life Ins. Co. v. EEOC,* 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402, 367–368 (1977) and *Alexander v. Gardener-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1973).

■ Despite our holding, the opposition clause of section 704(a) still protects numerous forms of opposition activity from employer retaliation. *See Hochstadt, supra,* 545 F.2d at 231. Examples of protected opposition activity include advising fellow employees of their rights under the law, *see EEOC v. Kallin, Phillips, Ross, Inc.,* 401 F.Supp. 66, 70–71 (S.D.N.Y.1975); or opposing an employer's unlawful discrimination by running for union office, *see, Tipler v. E. I. duPont de Nemours and Co.,* 443 F.2d 125 (6th Cir. 1971); or refusing to falsify a minority race applicant's test scores when requested to do so by a superior, *see Tidwell v. American Oil Co.,* 332 F.Supp. 424, 429 (D.Utah 1971). Our holding is limited to the particular opposition activity and other facts of this case.

■ We have concluded that defendant's discharge of King for his participation in the strike activity did not violate Section 704(a). An employer, however, may not use a legitimate reason for discharge as a pretext for the sort of discrimination prohibited by Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a).[9] *McDonnell, supra,* 411 U.S. at 804, 93 S.Ct. 1817. Consistent with this rule, plaintiff is granted leave to amend his complaint to properly plead a claim grounded upon Section 703(a). Because of our disposition of this case, defendant's motion to strike need not be considered at this time.

Defendant's motion to dismiss the complaint is granted; plaintiff is granted leave to amend his complaint in accord with the views expressed herein within thirty days; defendant to answer or otherwise plead twenty days thereafter.

---

**9.** Section 703(a) provides in pertinent part: "It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(a)(1).