497 F.Supp. 583 (1980)
Nathaniel MOSLEY et al., Plaintiffs,
v.
GENERAL MOTORS CORPORATION et al., Defendants.
No. 72 C 551(2).
United States District Court, E. D. Missouri, E. D.
September 30, 1980.
*584 Lee T. Lawless, Chackes & Hoare, St. Louis, Mo., for Lumpkins, Mosley and Centers.
James McDaniel, Barnard & Baer, St. Louis, Mo., for General Motors.
Morris J. Levin, Levin & Weinhaus, St. Louis, Mo., John A. Fillion/Edwin G. Fabre, Detroit, Mich., for Local 25 UAW.

MEMORANDUM
NANGLE, District Judge.
Plaintiffs brought this suit alleging that defendants discriminated against them on account of their race, in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e-2(a), and retaliated against them due to their protests of defendants' unlawful discriminatory practices, in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e-3(a).
This suit was tried before the Court sitting without a jury. This Court, having considered the pleadings, the testimony of the witnesses, the documents in evidence and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52, Federal Rules of Civil Procedure.

*585 FINDINGS OF FACT
1. Plaintiffs are Black male citizens of the United States. They reside in the City of St. Louis, State of Missouri. Plaintiffs Mosley and Lumpkins have been employed by defendant General Motors since May 1, 1968 and August 22, 1968, respectively. They are members of defendants International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) and Local 25 thereof, having been so since their initial hiring by General Motors, (hereinafter sometimes collectively referred to as "the union"). Plaintiff Centers was employed by defendant General Motors from July 7, 1969 until October 3, 1978, and was a member of the union during that time.
2. Defendant General Motors is a Delaware corporation doing business in the State of Missouri. It is an employer within the meaning of 42 U.S.C. § 2000e(b). Defendants UAW and Local 25 thereof are labor organizations within the meaning of 42 U.S.C. § 2000e(d) and (e).
3. The union was the collective bargaining representative of plaintiffs during the times relevant hereto, and all parties were bound by the terms of the collective bargaining agreements negotiated between the union and General Motors.
4. Plaintiff Centers initially filed discrimination charges against defendants with the Equal Employment Opportunity Commission (EEOC) on March 31, 1971. Plaintiffs Mosley and Lumpkins initially filed similar charges on September 16, 1970 and subsequently amended those charges on March 31, 1971, and April 2, 1971, respectively. This suit was initiated within ninety days of plaintiffs' receipt of Right to Sue letters from the EEOC.
5. Plaintiff Lumpkins initially sought employment with General Motors in 1957. He was told at that time that applications were not being accepted. A similar response was received when he again sought employment in 1958, 1959 and 1960. He was hired by General Motors when he applied in 1968.
6. Plaintiff Mosley initially sought employment with General Motors in 1965. His application was accepted and he was interviewed at that time, but he was never called back. The same results were obtained when he again sought employment in 1966 and 1967. He was subsequently hired when he applied in 1968.
7. Plaintiff Centers was hired when he first applied for a position with defendant. In his application, he stated that he sought a position as an inspector or a clerk. He was hired as a polisher in the sander-dry classification. Shortly after he was hired, he attempted to transfer to an inspector or clerk position, but was unsuccessful. Those positions are highly desirable, and consequently are filled by employees with the greatest seniority. New hires are very rarely placed in these positions.
8. There is no credible evidence to support plaintiff Centers' claim that a foreman directed a racial slur at him. The only testimony in this regard is Centers' own, which this Court considers to be of little worth. Throughout the course of this litigation Centers has vexatiously and unjustifiably obstructed the orderly processes of this Court. He has repeatedly proven himself uncooperative, although during most of the actual trial he conducted himself reasonably well. His credibility in this Court is minimal.
9. Plaintiff Mosley was always paid the wage rates called for under the agreements between the union and General Motors.
10. In January of 1971, Mosley was assigned to the assembly department. He sought to transfer to a more desirable position in the grinder plastic department. His request for this transfer was denied because, according to the seniority and transfer provisions of the agreements between the union and General Motors, a different employee was entitled to the job. There is no evidence that Mosley was denied this position in violation of the contract, and absolutely no evidence that race played any part in the decision.
11. On or about July 27, 1970, Mosley was loaned by his foreman to foreman *586 Gerst to fill in for an absent employee. Mosley felt the job he was assigned to do was highly undesirable. After doing the job for one day, Mosley vehemently protested to Gerst the next morning. A heated argument ensued. Though Gerst may have inadvertently touched Mosley with papers he was holding in his hands, there is no evidence to support Mosley's claim that he was struck in the face by Gerst. Mosley filed a grievance asserting such a claim. He was subsequently transferred out of Gerst's jurisdiction and expressed satisfaction with the union's obtaining this result for him. Indications are that this is all Mosley wanted in the first place.
12. In late 1968, plaintiff Lumpkins was assigned to a four-man car polishing operation. He was assigned to do work additional to that performed by the other three men on the job. He filed an overload grievance to protest this extra work. This grievance was processed by the company and the union in accordance with the provisions of the contract, and the job was subsequently modified. Lumpkins, however, had been transferred to a different job in the meantime. There is no evidence that plaintiff's race played any part in this transfer.
13. There is no evidence that the union ever failed to process a meritorious grievance presented to it by plaintiffs.
14. Almost from the beginning of plaintiffs' employment with General Motors, they believed that their employer discriminated against blacks. Efforts to resolve their problems through union mechanisms proved unsuccessful, and their disaffection soon spread to the union. Plaintiffs met with other black employees who shared their concerns and discussed methods to obtain action from the union and General Motors. The course of action ultimately agreed upon was a wildcat strike.
15. On March 23, 1971, plaintiffs, along with other black workers and activists in the black community picketed the General Motors plant. The picketing was organized and peaceful, and the picketers complied fully with all police directives. The picketing began slightly before the change of shift. As workers would arrive to work the picketers would urge them not to report to work and state that there was a wildcat strike in progress.
16. A sufficient number of workers heeded the picketers' requests that there were not enough workers to operate the assembly lines. All three lines on the second shift had to be shut down that day. The picketers thereby achieved their objective; they had intended from the start to force the closing of the plant by their actions.
17. Similar picketing occurred on March 30 and 31, 1971. On those days, however, less workers participated and less workers honored the picket lines. The plant was able to operate on both those days, despite the picketers' attempts to force a closing.
18. Plaintiffs were actively involved in the picketing. Plaintiffs Mosley and Lumpkins participated on all three days and plaintiff Centers on the first day. Plaintiffs Mosley and Centers actively urged others not to report to work, and this Court agrees with General Motors' contention that they were among the leaders of the picketing on the first day. Lumpkins was less active among the picketers, and General Motors treated him as such.
19. General Motors' reaction to the strike was swift. Management employees took notes and videotapes of the demonstration, so as to be able to identify all who participated. Disciplinary interviews were conducted with plaintiffs Mosley and Centers when they came to work on March 24. They were accused by management of violating paragraph 117 of the national agreement which prohibited unauthorized work stoppages during the life of the agreement. They were adjudged guilty of the violations and discharged on March 29. Centers' discharge was converted to a long term disciplinary lay-off on June 18, 1971, and he returned to work on June 21.
20. Plaintiff Lumpkins was not disciplined until after the last of the demonstrations. He was interviewed by the management when he reported to work on April 1, *587 and was indefinitely suspended at that time, due to his participation in the March 30 and 31 demonstrations. This suspension was converted to a balance of shift plus thirty days disciplinary lay-off on April 6.
21. Plaintiffs grieved their disciplines through the established procedures. The unions represented plaintiffs fully and fairly through all stages of the grievance procedure. Settlements were reached in March 1972 after appeals were filed to the umpire, the fourth step of the grievance procedure. Mosley's discharge was reduced to a sixty day disciplinary lay-off, and he was returned to work and paid $3,000.00. Mosley had been discharged for almost a year at the time of the settlement. Centers' disciplinary record was reduced to reflect a two week disciplinary lay-off, and he was paid $1,000.00. Lumpkins' disciplinary record was reduced to reflect a two week disciplinary lay-off, and he was paid for the balance of lost time. The union quite reasonably believed these settlements to be fair and just under the circumstances.
22. A total of 125 employees, all of whom are black, were disciplined as a result of the March 1971 demonstrations. There is no evidence to support Mosley's claim that several whites participated but were not disciplined. Initially 26 were discharged, 18 were laid off for thirty days, 8 were laid off for two weeks, and 73 were laid off for one week. After settlement of grievances, 6 remained discharged, 4 received sixty day disciplinary lay-offs, 8 received thirty day disciplinary lay-offs, 27 received two week disciplinary lay-offs, 7 received one week disciplinary lay-offs, and 73 received three day disciplinary lay-offs. Most employees also received some payment for lost pay. Under the terms of the contract, these disciplines remained on the employees' records for five years.
23. From 1965 through 1974, General Motors had experienced at least thirty-eight other unauthorized work stoppages at its St. Louis plant. Information is available as to only three such stoppages.
24. On September 14, 1973, a large number of employees refused to return to work after lunch to protest the inspection by management of union officials' briefcases. The line had to be shut down due to this refusal. Fifty-seven employees were disciplined for this unauthorized work stoppage, all of them initially receiving a balance of shift plus one week disciplinary lay-off. After settlement of grievances, the disciplines were reduced, and a majority of the employees involved had their records cleared.
25. On April 5, 1974 a large number of employees called in sick to protest an increase in the line speed at the plant. The line had to be shut down due to an insufficient number of workers present to operate it. One hundred twenty-three employees were disciplined for their participation: 5 were discharged, 7 were given 30 day disciplinary lay-offs, 4 were given two week disciplinary lay-offs, and 107 were given one week disciplinary lay-offs. After compromising through the grievance machinery, the resulting disciplines were as follows: 63 employees had their records cleared and were paid for all time off, 59 employees were given one week disciplinary lay-offs and were paid for time lost, and 1 employee was given a one week disciplinary lay-off and paid for all time lost in excess of one week.
26. Finally, the line had to be shut down on October 17, 1974 when 34 employees refused to return from lunch. Only 8 employees were initially disciplined, and after the grievance procedure the only discipline assessed was a balance of shift plus two week penalty given to a single employee.
27. There is no significant difference between the actions of the black protesters in March 1973, and its effect on General Motors, and the actions of the protesters in the three unauthorized work stoppages for which information was available, and the resultant effects on General Motors of these stoppages.
28. After grievance settlements, Lumpkins lost a total of two weeks' pay. This amounted to approximately $416.84. Centers lost a total of approximately $1,140.40, representing the sixty days of work he *588 missed, less the $1,000.00 he received in settlement. Mosley lost a total of approximately $2,137.60, representing the nearly one year he was off work less the money he received in settlement and less the money he earned elsewhere.
29. General Motors utilizes a progressive system of discipline. Due to the sixty day disciplinary lay-off which remained on Mosley's record after settlement of the grievance, subsequent disciplines were harsher than they otherwise would have been. Due to this progressive discipline system, Mosley received a total of twenty-nine additional days of disciplinary lay-offs which he would not otherwise have received, losing approximately $1,430.53 in wages.

CONCLUSIONS OF LAW
This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 2000e-5(f)(3).
Plaintiffs make various claims of racial discrimination in their relationship with defendants. They have not pursued in their post-trial materials some claims initially raised, and these claims will be considered abandoned. As to the remaining claims, this Court will first deal with those on which plaintiffs have clearly failed to prove their case.
Plaintiffs Lumpkins and Mosley assert that General Motors' refusal to hire them prior to 1968 constituted discrimination on account of their race in violation of 42 U.S.C. § 1981.
Neither plaintiff has shown that any application was actually made and rejected within the five years prior to September 11, 1972, the date of the filing of this suit. Any such claim is therefore barred by the five-year statute of limitations applicable to plaintiffs' § 1981 claims. Drake v. Southwestern Bell Tel. Co., 553 F.2d 1185 (8th Cir. 1977). This Court need not reach, therefore, plaintiffs' assertions that they were turned away even though jobs were available and they were qualified.
Also easily rejected are several claims of discrimination alleged by the various plaintiffs concerning isolated incidents at the plant. Centers has failed to prove that his initial assignment to the sander-dry department was racially motivated. His requests to be assigned to the inspection department or as a clerk were rejected due to his seniority, not his race. There is no suggestion that defendants' seniority system is anything but bona fide, and Centers' claim must therefore be rejected. International Broth. of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Likewise, Centers has not proven that a foreman actually directed a racial slur at him, much less that any alleged slur was anything more than an isolated example of bigotry by a single employee.
Mosley has failed to prove that foreman Gerst struck him or that the alleged striking was racially motivated. He has also failed to prove that he was denied the opportunity to transfer due to his race. Finally, Lumpkins has failed to prove that his transfer from the polisher position was racially motivated. There is no indication that race played any part in this decision, as is required to prove a violation of 42 U.S.C. § 1981.[1]Johnson v. Hoffman, 424 F.Supp. 490 (E.D.Mo.1977), aff'd. 572 F.2d 1219 (8th Cir. 1978).
Plaintiffs have also failed to prove that the union was discriminatory in its processing of plaintiffs' grievances with respect to the above claims. From all that was shown, this Court can only conclude that the union diligently and in good faith dealt with the specific claims presented to it. Plaintiffs have also launched a broad based attack on the union's pursuit of equal employment objectives. This Court must question whether such an attack is properly before it. All that is involved in this case are these plaintiffs' claims that the union discriminated against them. This is not a *589 class action. In any event, plaintiffs have not proven that the union has ignored such objectives or has discriminated against blacks. The union may not have set equal opportunity as its highest priority, but it has established a machinery to deal with discrimination claims, and there is no evidence that this machinery is not utilized when meritorious claims are raised by individuals.
Plaintiffs' main claims concern the discipline imposed by General Motors in relation to the March 1971 demonstrations. Plaintiffs initially assert that the discipline imposed was much harsher than that imposed upon similarly situated whites, in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a).
Under Title VII, plaintiffs have the initial burden of proving a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If plaintiffs satisfy this burden, the defendant must then articulate a legitimate, non-discriminatory reason for its actions. Id., Furnco Construction Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Plaintiffs then are given an opportunity to show that the articulated reason is merely a pretext for illicit discrimination. Furnco, supra.
What constitutes a prima facie case will necessarily vary according to the claim which is being asserted. Green, supra. In the instant case, there is no doubt that the discipline imposed was due to plaintiffs' participation in the demonstrations. This Court is not concerned with whether the discipline imposed, when viewed in an absolute sense, was overly harsh. The issue is whether the discipline imposed was harsher than that imposed on comparable persons of other races. For while defendant undoubtedly had the right to discipline employees without violating Title VII, it could not impose different standards on different races. Green, supra; McDonald v. Sante Fe Trail Transp. Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).
In the context of this case, plaintiffs establish a prima facie case by proving that they are members of the protected class, that they were disciplined, and that the discipline imposed was harsher than that imposed on comparably situated whites. Turner v. Texas Instruments, Inc., 555 F.2d 1251 (5th Cir. 1977); Williams v. Yazoo Valley-Minter City Oil Mill, Inc., 469 F.Supp. 37 (N.D.Miss.1978); Worthy v. United States Steel Corp., 616 F.2d 698 (3rd Cir. 1980); cf. Berbiglia, Inc. v. N.L.R.B., 602 F.2d 839 (8th Cir. 1979). An inference of discrimination arises upon the proof of a prima facie case because it is presumed that an act, if otherwise unexplained, was motivated by impermissible factors. Furnco, supra. The difference in treatment afforded plaintiffs raises this inference in this case, for it is presumed that a rational businessman would treat similarly situated offenders the same. In the instant situation, therefore, to dispel this inference, General Motors must articulate a legitimate, non-discriminatory reason as to why the discipline imposed was harsher than that imposed on similarly situated whites, not just as to why discipline was imposed. Turner, supra.
Plaintiffs have clearly established a prima facie case. In the other three instances of unauthorized work stoppages about which evidence was adduced, the vast majority of employees had their records cleared after compromising through the grievance procedure.[2] As to the March 1971 demonstrations, however, no employee had his record cleared. At the other end of the spectrum, the harshest discipline ultimately imposed in any of the other stoppages was a balance of shift plus two weeks disciplinary lay-off given to one employee. As to the March 1971 demonstrations, however, 6 employees were ultimately discharged and 45 employees received, at a minimum, a two week disciplinary lay-off. A similar disparity is evident as to the discipline initially imposed.
*590 Defendant General Motors has failed to rebut this prima facie case. As to two of the other work stoppages, September 14, 1973 and October 17, 1974, no evidence was offered at all. As to the third, April 5, 1974, the majority of defendants' witnesses professed to know nothing about it. The only witness who could recall anything about it said that the discipline imposed was different for two reasons. First of all, he claimed that General Motors could not identify the "leaders" of that work stoppage, so as to punish them more severely than others involved. This explanation, however, carries little weight in view of the fact that over half of the employees involved ultimately had their records cleared whereas none of the employees involved in the March 1971 demonstration had their records cleared. Were such a criterion employed, the March 1971 demonstrators who were believed to be "followers" by General Motors would have had their records cleared, as did the majority of those involved in the April 1974 demonstrations. This does not, therefore, explain the difference in treatment.
The other explanation offered was that most of the April 1974 demonstrators presented doctors' certificates explaining their absence. This explanation, too, carries little weight in view of General Motors' arguments in the grievance process that these certificates were obviously false and worthless.
This Court must conclude, therefore, that General Motors has failed to articulate a legitimate, non-discriminatory reason for the difference in treatment. It is therefore liable to plaintiffs for the pay they lost due to the discipline, plus costs and attorneys' fees. This Court rejects plaintiffs' claims for additional damages, such as Lumpkins' claim for damages due to emotional distress, as there is not sufficient evidence in the record to support such claims. Likewise, evidence supporting punitive damages under 42 U.S.C. § 1981 is totally lacking based upon the facts of this case.
Alternatively, this Court also believes that General Motors has violated the non-retaliation provisions § 704(a) of Title VII, 42 U.S.C. § 2000e-3(a). That section prohibits in substance, discrimination against any individual because he has opposed any practice made unlawful by Title VII.
There is no doubt in this case but that plaintiffs demonstrated to protest General Motors' and the union's alleged discrimination against blacks. Whether or not defendants actually discriminated against blacks is irrelevant, for it is undisputed that plaintiffs sincerely and reasonably believed them to do so. Sias v. City Demonstration Agency, 588 F.2d 692 (9th Cir. 1978). Plaintiffs argue, therefore, that their activities were absolutely immune from discipline. This Court can not go that far.
The protection afforded by § 704(a) is not unlimited. Green, supra, 411 U.S. at 803, 93 S.Ct. at 1824. Whether or not an activity is protected depends upon a balance of the setting in which the activity arises and the interests and motivation of both the employer and employee. Hochstadt v. Worchester Foundation, etc., 545 F.2d 222 (1st Cir. 1976); Jefferies v. Harris Cty. Community Action Ass'n, 615 F.2d 1025 (5th Cir. 1980); King v. Illinois Bell Telephone Co., 476 F.Supp. 495 (N.D.Ill.1978). This balancing must take into account the purpose of the Act to protect persons engaging reasonably in activities opposing discrimination, as well as Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel. Hochstadt, supra at 231.
In the instant situation, this Court must conclude that plaintiffs' activities transgressed the boundaries of legitimate protest. King, supra. Plaintiffs expressly set out to shut down General Motors' plant, and were successful in doing so. This was in direct violation of the no-strike provision in the contract. Plaintiffs had various avenues available through which they could express their beliefs. They chose a means which caused substantial hardship to General Motors and which nullified the important provisions of the collective bargaining agreement. Such a method is not immune from discipline. King, supra.
*591 This does not end the inquiry, however. For just as General Motors may not discipline blacks more severely than whites, so too it may not discipline those protesting racial concerns more severely than those protesting other problems. Therefore, what was said earlier in finding General Motors liable under § 703(a) applies with equal force to compel the conclusion that it is also liable under § 704(a). General Motors has offered no excuse as to why those protesting racial concerns were dealt with more severely than those protesting line-speed or management's interference with union activities.
Plaintiffs have not shown the union to have discriminated against them in its handling of the grievances concerning the March 1971 demonstrations. Though this Court has found the discipline imposed to have violated Title VII, the union was not presented with such a claim. Plaintiffs' grievances claimed that they had not violated ¶ 117 of the national agreement. Faced with such claims, the union did the best it could, and succeeded in substantially reducing the penalties imposed. The union negotiators were not before an umpire who would decide whether the discipline imposed violated Title VII; they were before an umpire who would rule on the basis of the agreement and the law of the shop. This is a significant difference. Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Faced with such a prospect, the union negotiators decided to settle the grievances in the manner they did. Plaintiffs have not shown this decision to have been made in anything but complete good faith. The union is therefore not liable to plaintiffs.
NOTES
[1] This incident occurred almost two years prior to the date Lumpkins first filed charges with the EEOC, and therefore may not be considered under Title VII.
[2] General Motors could not supply the race of the individuals involved in these other work stoppages, though plaintiffs requested such information. Since these stoppages had no racial overtones, this Court will assume that a mixture of blacks and whites were involved.