**Janice Mary Ann RYAN, Plaintiff,**

v.

**RAYTHEON DATA SYSTEMS COMPANY, Defendant.**

**Civ. A. No. 81–897–K.**

United States District Court, D. Massachusetts.

Aug. 28, 1984.

On Damages and Attorney's Fees Jan. 8, 1985.

Patricia Cohen, Michael J. Hoare, Chackes & Hoare, St. Louis, Mo., Shaevel, Shaevel & Gittes, Betty Gittes, Boston, Mass., for plaintiff.

Alfred C. Phillips, Lexington, Mass., William Patton, Steven Kaufman, Ropes & Gray, Boston, Mass., for defendant.

## Memorandum of Decision

KEETON, District Judge.

This is an action under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiff Janice Ryan alleges that Raytheon Data Systems Co. (RDS) violated Title VII by terminating her employment in July 1979. In her complaint, she requested reinstatement and money damages. The court has subject matter jurisdiction under 28 U.S.C. §§ 1331(a), 1343(4) and 42 U.S.C. § 2000e–5(f)(3). The case was heard in a two-day bench trial.

### I. *Applicable Law*

Typically in claims of disparate treatment like this one, plaintiffs proceed by the use of circumstantial evidence. The order of proof and the burdens required to be met in such a case are outlined in *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and clarified in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the prima facie case has been made, defendant has the burden of "articulat[ing] some legitimate, non-discriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. If defendant meets this burden, plaintiff then must show that the articulated reason was

a pretext for discrimination. *Id.* at 804, 93 S.Ct. at 1825; *White v. Vathally,* 732 F.2d 1037 (1st Cir.1984).

■ Plaintiff in this case offers direct evidence of discrimination, consisting of her testimony about a meeting she had with her employer J. Thomas Markley. Direct evidence, of course, is relevant at any stage of trial and may be used to satisfy plaintiff's burdens instead of the *McDonnell Douglas* formula. *Loeb v. Textron,* 600 F.2d 1003, 1017 (1st Cir.1979). Such evidence may consist of proof that specific decisionmakers were influenced adversely by considerations of plaintiff's gender. If plaintiff can prove that, but for the adverse gender-based actions of those decisionmakers, she would not have been terminated or would have received greater compensation at termination, then she has satisfied her burden of proof on the ultimate question in the case. Whether plaintiff chooses to prove her case by direct or circumstantial evidence or both, "[t]he central focus of the inquiry in a case such as this is always whether the employer is treating some people less favorably than others because of their ... sex...." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), *quoting Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The burden of persuasion as to this ultimate question rests on plaintiff.

■ Plaintiff also claims that her termination from employment was retaliatory. To succeed in such a claim, plaintiff must prove that she believed reasonably and in good faith that her employer was engaged in discrimination, that she acted reasonably in response to that belief and that her employer's desire to retaliate against her was a determinative factor in the employer's decision to terminate her employment. *Monteiro v. Poole Silver Co.,* 615 F.2d 4 (1st Cir.1980); *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222 (1st Cir.1976).

■ Plaintiff further claims that she was the victim of sexual harassment on the job. Title VII's provision that an employee's gender shall not affect the "conditions" of employment is a prohibition against permitting sexual harassment of female employees on the job. *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981). If the plaintiff claims that her refusal to accede to an employer's sexual demands or her opposition to sexual harassment on the job was the cause of her termination, then she must show that but for her response to sexual harassment she would not have been terminated. *Fisher v. Flynn,* 598 F.2d 663 (1st Cir.1979).

## II. *Findings of Fact*

Plaintiff was hired by RDS in December 1976. Her job title then was manager of operations integration. This was considered a "line" management position. She had responsibility for day-to-day operations in her area.

Plaintiff performed well in her first year of employment at RDS. At the end of 1977, she was evaluated by Markley, the president of RDS, who gave her an overall rating of "one plus," even though the rating scale employed at RDS normally had "one" as the highest rating. Plaintiff also received a 16.7 percent salary increase at the end of 1977, as well as a $2,000 bonus. The size of this increase and the fact that she received a bonus are indicators that her performance was satisfactory to her employers at that time.

During the course of 1978, Markley reorganized the top management level at RDS. Part of this reorganization consisted of expanding his own staff. In January 1979, plaintiff was transferred to one of these staff positions, again with responsibility for operations integration. The job change meant that she would have less responsibility for day-to-day operations and would instead concentrate on long-range planning.

The parties dispute whether this job change was a "promotion" or an indication that Ryan was no longer performing adequately in her "line" position. It is true

that, during her time at RDS, plaintiff was experiencing difficulties in several areas of responsibility, such as implementing an information system called ROSS. These difficulties are reflected in a series of memoranda from plaintiff to Markley. *See, e.g.,* Exhs. 204, 215. David Levi, then the executive vice-president of RDS, testified that he had been critical of Ryan's performance and that he told Markley, at the time of the reorganization, that he preferred not to have plaintiff on his staff. Nonetheless Ryan received a $2,000 bonus at the time of her change in job title at the beginning of 1979. Her performance was not evaluated at that time and she was not awarded a salary increase.

In March 1979, plaintiff attended a meeting of the president's staff, at which Markley announced that in the future he would be making business trips on a regular basis. Plaintiff says that Markley specifically stated at that time that he would be travelling with Ryan. Markley testified that he only stated he would travel with members of his reorganized staff. In either event, the implication was clear that Ryan would be among those travelling with him; it was particularly clear as a reference to Ryan, because she had just recently been added to the president's staff.

Plaintiff testified that, after this meeting, she was concerned about the prospect of travelling alone with Markley. She does not say that she was concerned that he would use these trips as an opportunity to make sexual demands of her. In fact, she concedes that he never, in the course of her employment at RDS, made any sexual advances to her. Nonetheless, she testified that she was concerned that, by travelling alone with Markley shortly after having been moved to his staff, she would be subject to office rumors or gossip that she was having a sexual relationship with Markley and that she had gotten her job as a result of such a relationship. She was afraid that such gossip would impair her effectiveness.

On March 17, 1979, Ryan submitted a memorandum to Markley asking for authorization for her to make two business trips accompanied by Diane Cassidy. Exh. 28. Plaintiff had hired Cassidy as her secretary. She stated that she had been giving Cassidy greater responsibility over time and was grooming her to serve as a liaison between field managers and the president's staff. Ryan had travelled with Cassidy on two earlier occasions.

In her March 17 memorandum, Ryan stated that she had two reasons for bringing Cassidy with her. She noted that Cassidy had been helpful on earlier trips. She also stated as a rationale for bringing Cassidy along:

> My husband Tom does not like me to travel alone and it is often uncomfortable travelling with male members of the staff. Put quite frankly, although it is flattering, the rumors which are inevitably generated are becoming quite stale. Although I once kiddingly inferred that my love life was less than monogamous, the opposite is true as I am certain you are aware. I am extremely happily married and despite the fact that these remarks don't hurt me directly any longer, I resent their demeaning effect on Tom.

Ryan received no response from Markley to this memorandum.

Some time later, Ryan received her requests for authorization of travel returned unsigned from Markley's office. On March 28, she sent a second memorandum to Markley, asking again for him to sign the authorization. Exh. 30. Not having gotten a response, she wrote another memorandum on April 4 about the travel requests. Exh. 31. In this memorandum, she again stated she had two reasons for taking Cassidy along on the trips. She said she wished to acquaint Cassidy with field operations. She also wrote: "I'm particularly sensitive about travelling alone at this point in time—I'll get over it so please be understanding and patient. I hope you'll agree that this request is not unreasonable under the circumstances." Exh. 31.

Shortly afterward, Markley and Ryan had a meeting during which they discussed her travel requests. She reiterated her

concerns about travelling alone. She testified that, during the discussion, Markley became extremely angry with her, made negative comments about women and concluded that her job was in jeopardy. Markley in his testimony said he believed that he did meet with Ryan to discuss the travel requests, but didn't recall the substance of the meeting. I credit Ryan's version of the meeting.

Again on May 15, Markley met with Ryan. At this meeting, he told her that her employment was being terminated. On May 17, Ryan wrote him a memorandum, in which she requested a year's salary as severance compensation. Ryan met on May 23 with Daniel Mulkeen, the personnel director at RDS, who rejected her request. She then wrote another memorandum to Markley, in which she asked him to reconsider Mulkeen's decision. She wrote:

> It seems ironic for Dan [Mulkeen] to denounce my requirements as unreasonable, suggesting now, at a point of my imminent departure from RDS, that I be treated like "one of the guys" when this luxury was never afforded to me during my entire tenure within the division. Had it been, this entire issue would be a moot one.

After receiving this memorandum, Markley asked Richmond Miller to prepare some notes on Ryan's performance at RDS. Miller spoke with John Tincler, the RDS vice president. He then wrote a memorandum to Markley in which he reported various criticisms of Ryan's performance. At one point, he stated that, when giving reports for groups of other managers, "her manner of presentation and attire was the ultra female approach so that she would not get eaten up by one of the boys." In this memorandum, Miller recommended that Ryan be paid four months' salary as compensation after her termination on July 1, 1979. He noted that such a "golden handshake" could forestall claims of "sex harassment and discrimination." Exh. 221. Miller's recommendation was not adopted. On June 7, Ryan received notice that she was being terminated as of July 10 and would receive one month's salary as severance pay. Exh. 222.

Following the termination of her employment at RDS, Ryan spent a year taking a full load of courses for a master's degree in business administration. While working at RDS, she had been taking only a partial course load. However, during the year after termination, she took these courses in the evening and remained free to seek employment during the daytime.

In early 1980, plaintiff consulted Gerald Evans, who operated a business finding employment for executives. Evans attempted to speak with RDS managers to see what kind of references they would give Ryan. He was told by Tincler that any references for Ryan would have to come from Mulkeen in the personnel office. Evans testified that this was an unusual practice. Mulkeen was uncooperative and said he couldn't give any information without a release from Ryan. Ryan wrote a release in February 1980. Exh. 50. Mulkeen responded with a short letter to Evans in which he stated that Ryan's position had been eliminated because of reorganization. Exh. 51. He did not provide any comment about her performance. Nor did he say whether she was eligible to be rehired by RDS, a question Evans had specifically asked because, when Ryan had been terminated, she was put on "layoff" status, the usual status for terminating executives. Evans said he was unsuccessful in future attempts to get information from Mulkeen.

In March 1980, Ryan's husband was offered a position in a hospital in Florida, which he accepted. At that time she stopped looking for employment in Massachusetts. She moved to Tampa in the summer of 1980. She has not been successful in finding full-time employment since then.

### III. *Evaluative Findings and Conclusions*

Essentially plaintiff makes two claims: that her termination was the result of sex discrimination and that she was accorded different treatment than others, all of whom were males, in the awarding of sev-

erance pay. I consider first the claim concerning her termination.

■ Plaintiff has argued that her termination was a retaliation by Markley in response to her opposition to discriminatory conduct. The argument plaintiff makes is that she reasonably believed that she would be subject to sexual harassment in the form of rumors concerning her relationship with Markley if she travelled with him alone on business trips. She argues that her request that she be allowed to travel with Diane Cassidy was a reasonable response to this belief and that Markley terminated her because of her request and so was guilty of retaliation. Defendant argues that plaintiff is seeking a special accommodation on account of her sex, which was not afforded male managers. Defendant also argues that plaintiff has not made a case of sexual harassment, because she never suffered any actual sexual advances from Markley.

I conclude that plaintiff has not proved a case either of sexual harassment or of retaliatory firing. In order for her claim of retaliation to succeed, I would have to conclude that, in asking that she travel with Cassidy, plaintiff was objecting to conduct which she reasonably believed to be discriminatory. But, even by plaintiff's version of the facts, what she was attempting to do at that point was not to redress or protest discriminatory treatment, but rather to prevent such treatment from taking place and to prevent rumors about her from beginning to spread. Thus this case does not fit within the analysis employed in *Hochstadt* and *Monteiro*. Because I am not accepting the theory that this was a retaliatory firing, I need not consider the many legal questions presented by this theory, such as whether an employer is obligated by Title VII to afford women employees special treatment which might be a reasonable means of preventing the occurrence of sexual harassment by male colleagues or the spread of rumors concerning sexual relationships with male colleagues.

Although plaintiff's termination was not retaliatory, the legal inquiry does not end there. I must consider whether the termination was itself an act of sex discrimination.

■ Plaintiff has offered sufficient evidence, both circumstantial and direct, to prove her prima facie case that this termination was discriminatory. I credit, as I noted above, her version of her meeting with Markley in early April 1979, in which he expressed extreme anger both at her suggestion that she be allowed to travel with Cassidy and at the reasons she expressed for that suggestion. Both the severity of his response to her request and the remarks he made about women at that time are evidence of discriminatory animus. Further, I find there is circumstantial evidence that plaintiff's termination was discriminatory. Before March 1979, she had not experienced any serious employment problems. It is true that there were some problems with her "line" operations and that some other managers were less than enthusiastic about her performance. Nonetheless, there is no evidence that she was told that she was having a performance problem or that her employers contemplated any adverse action against her at that time. Although her job change from a line position to the president's staff may not have been a clear vote of confidence, it was not a demotion by any means. This job change indicates that, at that time, the top managers at RDS considered plaintiff to be a person with promise and the ability to perform when she was placed in the right organizational niche. Thus, I conclude that plaintiff was qualified for the position from which she was terminated. Also I find that the position remained open after her termination within the meaning of the *McDonnell Douglas* test. I do not need to find that a person was given exactly the same job title as Ryan after her termination. Creating such a rigid requirement would allow employers to cover up discriminatory action with a minor alteration in an organizational chart. Instead, I find that Ryan's function of long-range planning was filled by other persons in RDS after her termination. I find that she was not terminated

because the need for her job functions ended or because of a reorganization that altered the management structure at RDS.

Having concluded that the prima facie case is proved, I consider whether defendant has articulated non-discriminatory reasons for terminating Ryan and whether these reasons are pretextual. Defendant claims that Ryan had been demonstrating poor performance in a number of areas. I note defendant's evidence that there were, at the time of Ryan's termination, various problems with her performance. For instance, she had experienced difficulty in making the ROSS system functional. Exh. 215. She also had inconsistently evaluated one of her subordinates. Exhs. 211, 216. Markley also testified that he was concerned when he learned, shortly before Ryan was terminated, that Cassidy had been assisting Ryan in her school projects. Exh. 214.

I conclude however that these reasons were not causes of plaintiff's termination. The problems with the ROSS programs had been longstanding and had been occurring before the beginning of 1978, when she received an excellent evaluation. *See* Exh. 204. Despite continuing indications of problems with the ROSS program, no one counselled Ryan that her job was in jeopardy. As 1978 ended and 1979 began, she was given a bonus and was moved to a new position in the president's office. Markley conceded on cross-examination that at the time he authorized the bonus and job change he was not considering terminating Ryan's employment. As to the inconsistent evaluation of a subordinate, the evidence indicates that the top managers at RDS did not consider this a serious enough problem to terminate Ryan's employment. Although they requested further explanation of the evaluations, which she provided, they did not respond further. Ryan was not questioned about this incident at any of the meetings with Markley which led up to her termination. The same observations are true of the fact that Ryan was allowing Cassidy to assist her on her school assignments.

Even more telling evidence that Ryan's termination was discriminatory is its suddenness. Within a month after the meeting at which Markley announced he would travel with his staff, Ryan was told that her job was in jeopardy. The inference is compelling that the termination was in response to her requests to travel with Diane Cassidy and to the rationale she offered for those requests.

Defendant argues that her requests for such travel were unprofessional and that they alone provided a non-discriminatory basis for terminating her employment. But I find that Markley's response so far outweighed the supposed impropriety of Ryan's request that this claimed rationale for the termination is pretextual. First, Ryan had travelled with Cassidy on at least two occasions without objections. Whether or not this was known to Markley, it was known to others and had been authorized. Second, Ryan did not refuse to travel alone or without Cassidy. She simply made a request.

In concluding that Ryan's travel requests were not the reasons for her termination, I am not making any finding about whether those requests were proper or necessary. I am not holding that it would have been discrimination for RDS to refuse to allow Cassidy to accompany Ryan. I am not addressing the problem of what accommodations must be made for a female executive who faces actual or perceived sexual harassment or rumors of sexual relationships while travelling alone or with male colleagues.

Instead, I am finding on the specific facts of this case that Markley's response to Ryan's travel requests was discriminatory in the sense that his response was more severe than it would have been had Ryan been a man. I find that, had a male executive expressed reservations about travelling with a female colleague because of the comments that might arise, Markley would not have reacted with such anger and vehemence. Nor, without further attempts to resolve the problem, would he have terminated that executive's employment. In oth-

er words, Ryan's travel requests were not reasons in themselves for her termination, but were instead the trigger for discriminatory treatment of Ryan. This finding is reinforced by the testimony plaintiff offered concerning Markley's derogatory comments about women made at the April meeting between Ryan and Markley.

There is other evidence in support of the finding that the real motive behind Ryan's termination from employment was sex discrimination. I credit Gerald Evans' testimony that RDS personnel behaved in an unusual manner when asked about Ryan after she was terminated. This testimony was not contradicted. Mulkeen did not testify. The fact that Ryan was being treated in an unusual manner supports the conclusion that this was not the case of an executive experiencing performance problems who was asked to leave by employers concerned about management efficiency, but of a woman who was fired for improper, non-business reasons by employers who treated her afterwards in a grudging, unbusinesslike manner.

Arguments of the parties have called attention to a memorandum prepared by Richmond Miller, Exh. 221. This memorandum did not play a role in Ryan's termination, which had already been effectively accomplished before it was written. Nonetheless, it is evidence that Ryan was being subjected to discriminatory evaluations by her employers. The memorandum reveals that Miller, at least, viewed Ryan as deficient in some way because she did not want to be treated as "one of the guys." Markley's response to the travel request is of much the same type. When Ryan acknowledged a problem that arose because of her situation as the only high-ranking female executive in RDS, Markley reacted, not by rejecting her proposed solution, but by making highly negative and personal responses to Ryan herself, responses which were gender-based.

■ Having concluded that Ryan's termination was discriminatory, I next turn to plaintiff's contention that she was discriminated against in her severance benefits because she was a woman. I do not find that plaintiff has proved this claim. First, she offers little evidence of men who were treated better. Her chief example is an employee who was terminated three months after he moved from Denver, Colorado, to take a job at RDS. The facts of his situation are so different that I can not conclude he received more severance compensation because he was a man. Second, it was official company policy, clearly stated in directives to managers, Exh. 241, that the maximum severance compensation for an employee like Ryan with less than five year's service would be one month. I do not find that exceptions would have been made for Ryan but for her gender.

■ Having concluded that Ryan suffered discrimination in her termination, I must consider the scope of the harm caused by the improper termination and the appropriate relief. In this case, I conclude that reinstatement would not be appropriate. Plaintiff's proof is insufficient to show that, but for her being a woman, she would have maintained her status at RDS in the long term. Moreover, the circumstances of Ryan's termination left considerable acrimony. A principal part of Ryan's former job involved her daily interactions with other top-level managers. These working relationships can not be restored by court order and reinstatement would only place Ryan in a position where she could never satisfy company needs or serve her own career interests.

■ A back pay award, however, is appropriate. Defendant argues that Ryan is entitled to no back pay because she did not mitigate her damages by making a reasonable search for employment after her termination. I find however that, for the first nine months following her termination, Ryan did act reasonably in seeking to find new employment. Defendant's argument to the contrary is that she was going to school full time. However, Ryan went to school only during the evenings. She would have been able to begin a work assignment during the daytime. Also, it was reasonable for her to expect that her

job search would take some time and that this time would be well spent in accelerating her progress toward a master's degree that would ultimately enhance her marketability.

More importantly, I find Ryan acted reasonably in light of defendant's actions towards her after her termination. She was justifiably concerned that she would not get positive recommendations from her former employers, a fact that would be highly detrimental to her effort to get a position elsewhere. By going to school full-time, she was enhancing her employability.

Ryan testified that in March 1980, she and her husband decided to relocate to Florida. This move was made because of changes in her husband's career. Not only was it not done to further Ryan's career, but the relocation had a negative effect on her job search. She admits that she no longer job-hunted in Massachusetts following March. Because defendant has met its burden of proof that plaintiff failed to make reasonable efforts thereafter to mitigate her damages, I conclude that the period for which Ryan may collect back pay should be cut off as of the end of a reasonable period after she ceased active efforts to obtain employment in the Massachusetts market, where it was to be reasonably expected she would have remained unless voluntarily resigning from RDS. Taking into account the time when she did in fact move to Florida (the summer of 1980), as well as the time lag ordinarily occurring between obtaining a new position and commencing performance, I find that the period for which back pay should be awarded terminated at the end of June 1980.

Although Ryan was terminated as of early July 1979, she received one month's salary as severance compensation. The award of back pay should be reduced by that amount. Thus, Ryan is entitled to the salary she would have received from early August 1979 until the end of June 1980.

A second ground on which I deny plaintiff's claim for loss of pay after the end of June 1980, is that I can not find from a preponderance of the evidence that, but for gender-based discrimination, she would have maintained her position in RDS for the long term. I do find however, from a preponderance of the evidence, that, despite reservations among some of the higher executives at RDS, overall she was so favorably regarded in early 1979 that both she and the higher executives would have agreed upon continuation of her employment at RDS at least through the next regular evaluation, due at the beginning of 1980, and thereafter through June 1980. As the period of time considered beyond calendar year 1979 lengthens, a reasoned inference from a preponderance of the evidence that she would have remained at RDS becomes less clear and more speculative. I do not find that plaintiff has met her burden of proof by a preponderance of the evidence as to the continuation of her employment at RDS, but for sex discrimination, beyond June 1980.

The parties are directed to consult to determine if they can stipulate as to (1) the precise amount of damages to be awarded in accordance with this memorandum and (2) the claim for attorney's fees which was deferred by agreement at trial. If they have not agreed, the parties shall file simultaneous submissions as to their respective positions on or before September 17, 1984. Responses may be filed on or before September 27, 1984.

On Damages and Attorneys' Fees

This case was tried before the court without a jury on August 2–3, 1984, and with the understanding that evidence and arguments bearing upon any claim for attorneys' fees would be deferred until the court had decided the basic claims. On August 28, 1984, the court entered a Memorandum of Decision. In that decision, having rejected the contrasting dispositions requested by the parties in their proposed findings and conclusions, and having determined instead that plaintiff is entitled to compensation for a period commencing August 1979 and terminating June 30, 1980, the court directed that the parties confer to determine whether they could stipulate as to the

amount of the judgment, including attorneys' fees, and if not to file their respective submissions on these remaining issues. Numerous and extensive submissions were subsequently filed, some before and some after a conference in chambers on November 2, 1984, and the remaining issues are now before me for decision.

## I.

I conclude that the judgment to be entered in this case is as follows, subject to an opportunity for further submissions on attorneys' fees as stated in part III, *infra*.

a. Salary, at $2,917 per month, from August 8, 1979, through June 30, 1980 — $31,357.75

b. Stock options, 334 at a value of $42.875 each — 14,320.25

c. Interest at 12% on items a and b, to be calculated by the Clerk when entering judgment — ———

c. Attorneys' fees and expenses of litigation — 41,687.75

## II.

*Findings and Conclusions on the Amount of the Back-Pay Award*

1. Plaintiff had been paid $2,917 per month during approximately the last 18 months before her discharge. She received no salary increase at the time of her 1979 salary review. She was not due for another salary review until 1980. I find that senior management's appraisal of her performance would have led to no increase at the time of the 1980 review.

Plaintiff has argued for a 10% salary increase on July 1, 1979, and a 10% salary increase on January 1, 1980. I find no evidence whatsoever before me on the basis of which an inference could fairly be drawn that increases in these amounts would have occurred. On the evidence as a whole, I find that her performance was being perceived by top management in more reserved terms apart from the gender-based discrimination that I have found in this case and that, apart from that discrimination, she would not have received any salary increase on July 1, 1979 or thereafter. For like reasons, I find that she would not have received a further bonus at any time before her employment

would have been terminated had discrimination not occurred.

2. Plaintiff received a bonus of $2,000 in 1979 as she was moving into the new staff position. I find that she would not have received a bonus in 1980 in view of the more reserved assessment of her performance, apart from any effect of any gender-based influence on the assessment.

3. Had she remained in the employ of RDS for the period at issue, she would have been allowed to exercise an additional 334 stock options, after the completion of three years with RDS, at the price of $31.875 per share. Exhs. 4 and 12. On June 30, 1980, Raytheon stock traded at an average price of $74.75 per share. Thus, the value of the options was $42.875 each.

4. Plaintiff argues that her termination caused her to sell stock at a loss. The evidence before me supplies no basis for such a finding. I find that plaintiff has wholly failed to prove this contention.

5. Prejudgment interest on back-pay and stock-option value is to be calculated at the rate of 12% per year from the dates payments and options were due to the date of entry of judgment. Mass.Gen. Laws ch. 231, §§ 6B, 6C, 6H.

6. Plaintiff received $3,500 in unemployment compensation benefits on account of her layoff. Her receipt of this sum resulted directly from defendant's payment of unemployment compensation insurance premiums. Thus, this is not a benefit from a "collateral source" in the traditional sense. However, given the split among the circuits on this question and the absence of a First Circuit ruling, I conclude that I should decline to deduct unemployment compensation benefits, following the view of the greater number of circuits that have addressed the issue. *See Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 81–85 (3d Cir.1983) and cases there cited.

## III.

*Attorneys' Fees*

In determining plaintiff's claim for attorneys' fees, I am guided by *Hensley v. Eck-*

*erhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The plaintiff in this case presented a total array of claims wholly out of proportion to what I have found to be meritorious. Defendant, likewise, has maintained an untenable position—that plaintiff was entitled to nothing—and now characterizes the outcome as one in which the plaintiff prevails on the basis of a legal theory that her counsel had never propounded at any stage of these proceedings. The positions of both parties reflect more zeal than merit.

It is true that plaintiff's claim for discriminatory discharge was reasoned on grounds that would have produced a judgment many times in excess of the judgment I have determined to be appropriate. It is nevertheless true that the claim I have allowed is a claim for discriminatory discharge—a discharge that would not have occurred but for the gender of the plaintiff—and discriminatory discharge is one of the grounds of claim advanced by the plaintiff.

Moreover, I accept plaintiff's contention that defendant's assertion of pretextual grounds for discharge made it appropriate if not necessary for plaintiff's counsel to conduct a full and thorough investigation of all the pretextual claims, and to defend against them at trial. Investigation was necessary to prepare to refute each pretextual argument advanced by defendant. Fees are to be allowed for all time reasonably required to accomplish this investigation and defense.

I find merit, however, in the defense contention that had plaintiff asserted only the claim on which she prevailed, the resources expended in preparation and trial of this case (even assuming, as I do for this purpose, that it would not have been settled) would have been substantially less than the resources that have in fact been committed to resolving this dispute.

Also, I do not find support for plaintiff's contention that her counsel's zealous advancement of nonmeritorious claims of sexual harassment and retaliatory discharge in any way contributed to the favorable result on the claim of discriminatory discharge. Indeed, as factfinder I am more disposed to the view that counsel's persistent advancement of nonmeritorious claims was distracting and made it more difficult for me as factfinder to see in the evidence as a whole the support I have found for the claim of discriminatory discharge.

■ I conclude that this is a case in which, although the wrong done by defendant was substantial and entirely without justification, nevertheless "the plaintiff achieved only limited success" in comparison with what she sought, and she should now receive "only that amount of fees that is reasonable in relation to the results obtained." *Hensley*, 461 U.S. at 440, 103 S.Ct. 1943.

■ I conclude also that I should disallow any fee for time spent on the case after entry of the court's Memorandum and Order of August 28, 1984, because I find that plaintiff's contentions regarding the appropriate amount of the award due, under the rulings stated in the Memorandum and Order of August 28, 1984, have been plainly excessive. I find further that these excessive contentions have imposed on defendant an unfair burden that completely offsets what would have been a reasonable allowance of attorney fees for representing the plaintiff's interests reasonably and successfully, to the extent of the merit of plaintiff's position, in post-trial proceedings.

■ I reject defendant's contention that no allowance should be made for services of plaintiff's attorney in the administrative proceedings that preceded the action in court. Those proceedings were an essential predicate to court proceedings. The fact that she did not prevail before the EEOC is not decisive. It is the final outcome of the court proceedings that determines the extent to which plaintiff is a prevailing party. Plaintiff's request for an allowance of $693.75 for services rendered by her attorney Leonard DePaola in the administrative proceedings is supported by the submission before me and is allowed.

■ I conclude also that it is inappropriate to apply a per se rule that attorneys' fees should be limited to what would have been reasonable had the plaintiff engaged a lawyer located at the site of the court in which the action is brought. Moreover, the hourly rate charged by plaintiff's lead counsel, whose principal practice is in St. Louis, Missouri, is lower than customary charges of counsel of comparable experience and qualifications practicing regularly in Boston. Thus, on balance, defendant is not prejudiced by plaintiff's choice of distant counsel. I find also that the use of local counsel was reasonable, and the claim of $645.00 in fees and expenses charged by Betty Gittes as local counsel is reasonable and proper as an allowance of fees for services that contributed generally to the advancement of plaintiff's case and thus to the favorable outcome as to that part of the case in which plaintiff prevailed.

■ On the other hand, I find it inappropriate to allow a claim for time spent in travel by counsel whose office is hundreds of miles distant from the place where the case is pending, at regular hourly rates for professional services. Absent a showing as to what proportion of the travel time was spent in working on the case rather than merely travelling, I find that a reasonable accounting for travel hours is to include them at half the regular rate. Cf. Maceira v. Pagan, 698 F.2d 38, 40–41 (1st Cir.1983); Miles v. Sampson, 675 F.2d 5, 9 (1st Cir.1982); Furtado v. Bishop, 635 F.2d 915, 918 (1st Cir.1980).

■ I disallow time spent in negotiating, reviewing, and drafting the fee arrangement between the plaintiff and her counsel. This time is not spent in pursuing a claim on which plaintiff prevails.

■ I conclude that the time of only one attorney for attending each deposition should be allowed in this case. The nature of the case is not such as to justify participation of two attorneys in taking a deposition.

■ Plaintiff's claim for reimbursement of her own transportation, lodging, and food for attendance at depositions and trial is allowed. I reject the defense argument that by moving to Florida for personal reasons plaintiff thereby surrendered any claim to reimbursement of expenses of transportation and lodging reasonably necessary to her attendance at trial and at the taking of depositions (which included her own) on successive days in Boston. Also, plaintiff's claim for transportation, food and lodging of her counsel for attendance at trial is allowed. The choices made both by plaintiff and by her counsel as their accommodations were entirely reasonable, the expenses were modest, and they are allowed in full.

With the foregoing rulings as guidelines, I have examined the plaintiff's factual submission on attorneys' fees in this case. I credit the time records submitted by plaintiff's counsel. As plaintiff's counsel has observed, however, extracting from the contemporaneous time records those parts of the time spent on issues on which plaintiff did not prevail is a task that cannot be accomplished with precision. Nonetheless, I do find that the deletions of time as shown on the exhibit attached to plaintiff's Memorandum Regarding Attorneys' Fees and Litigation Expenses (Docket No. 75), filed November 19, 1984, fall considerably short of adherence to the rulings stated above. In that Memorandum, plaintiff claims the following in total:

| | |
|---|---|
| Leonard F. DePaola | $    693.75 |
| Betty A. Gittes | 645.00 |
| Michael J. Hoare | 33,660.00 |
| Patricia L. Cohen | 16,640.00 |
| Litigation Expenses | 10,349.00 |
| | $ 61,987.75 |

On the basis of the submissions before me, and with the rulings stated above as my guidelines, I find it appropriate to reduce the amount for services of Michael J. Hoare to $20,000 and the amount for services of Patricia L. Cohen to $10,000.

I am sensitive to the fact that counsel and I have already spent an inordinate amount of time on the issue of attorneys' fees. As a matter of sensible judicial ad-

ministration, I adopt the following procedure at this time: Rather than requiring further submissions in light of the rulings stated in this Memorandum, I will enter tentative findings as follows, which will stand as my findings in the absence of further submissions, within ten days, showing cause for modification:

| | |
|---|---:|
| For services of Leonard F. DePaola | $ 693.75 |
| For services of Betty A. Gittes | 645.00 |
| For services of Michael J. Hoare | 20,000.00 |
| For services of Patricia L. Cohen | 10,000.00 |
| For reimbursement of litigation expenses | 10,349.00 |
| Total attorneys' fees and expenses | $ 41,687,75 |

In the absence of further submissions within ten days as to attorneys' fees and expenses, the Clerk will be directed to enter final judgment accordingly.